ORIGINAL

1  CONSTANTINE CANNON LLP
   Wayne T. Lamprey (CA Bar No. 95408)
2  Email: wlamprey@constantinecannon.com
3  Hallie E. Noecker (CA Bar No. 307918)
   Email: hnoecker@constantinecannon.com
4  Edward A. Baker (VT Bar No. 4732)
5  (*pro hac vice forthcoming*)
   Email: ebaker@constantinecannon.com
6  Matthew L. Cantor (NY Bar No. 2740918)
7  (*pro hac vice forthcoming*)
   Email: mcantor@constantinecannon.com
8  150 California St., 16th Floor
9  San Francisco, CA 94111
   Telephone: (415) 639-4001
10
11 Attorneys for Plaintiff-Relator



FILED

JUN 2 6 2019

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                    DEPUTY



12
13            **UNITED STATES DISTRICT COURT**
14
15      **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

16  UNITED STATES OF
    AMERICA,                          CASE NO.:    **'19CV1199 H   WVG**
17  *ex rel.* 3729, LLC,
18                                    COMPLAINT FOR
                      Plaintiff-Relator,   VIOLATION OF FALSE
19                                    CLAIMS ACT
20              v.
                                      **FILED IN CAMERA AND**
21  EXPRESS SCRIPTS HOLDING           **UNDER SEAL PURSUANT**
22  COMPANY and EXPRESS               **TO 31 U.S.C. § 3730(b)(2)(b)(2)**
    SCRIPTS, INC.
23                    Defendants.     **JURY TRIAL DEMANDED**
24
25
26
27
28

2

Relator 3729, LLC brings this action to recover damages and civil penalties on behalf of the United States of America (the "United States") arising from false and/or fraudulent statements, records, and claims made or caused to be made by Express Scripts Holding Company, Express Scripts, Inc., and/or their agents and employees (collectively, "Express Scripts"), to the United States in violation of the federal False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "FCA").  Relator alleges upon first-hand knowledge, information, and belief as follows:

## I.     INTRODUCTION

1.     This case concerns the flagrant and persistent over-dispensing of prescription drugs to millions of patients by Express Scripts, a national pharmacy benefit manager ("PBM") and pharmacy.  Express Scripts dispensed the prescription drugs at issue pursuant to a contract with the U.S. Department of Defense ("DoD") to provide critical pharmacy services, including mail-order delivery of prescription drugs, to uniformed service members and their families enrolled in Tricare, the U.S. military's comprehensive health insurance program.

2.     As part of this fraudulent scheme, which occurred from at least October 2009 until early 2018 (the "relevant period"), Express Scripts submitted, or caused to be submitted, false claims to the DoD.  These false claims were for mail-order pharmacy dispensing fees, and the cost of replenishing the DoD's prescription drug supply, related to the care of Tricare beneficiaries whose prescriptions were placed on automatic delivery.  As a consequence of Express Scripts' scheme, Tricare beneficiaries received far more maintenance drugs than were medically necessary or appropriate.

3.     Express Scripts implemented its scheme in two ways: (1) enrolling as many Tricare beneficiaries as possible in automatic delivery; and (2) calibrating the logic of Express Scripts' pharmacy dispensing software so that a full days-supply of each maintenance prescription was automatically dispensed at the 67%

3

usage date (*e.g.,* 60 days on a 90-day supply), with the refill "clock" immediately reset after each refill for the life of a prescription.  Under this logic, for a 90-day supply prescription on auto-refill, a full 90-day supply of pills was dispensed on day 60 (*i.e.,* at the 67% usage date) and again every 60 days thereafter.  Assuming a dosage of one pill per day, this auto-refill pattern caused an excess of 265 pills— an extra nine-month supply—to be dispensed for each prescription over the course of a year.  *See* Exhibit 1.  Because Express Scripts sought to renew each maintenance prescription without first seeking Tricare beneficiaries' permission, the effect of this dispensing practice was greatly amplified over time, generating enormous piles of drug waste.



4.      In effect, Express Scripts operated a refill "pill mill" by systematically dispensing 50% more pills for each days-supply (*i.e.,* 1.5x the appropriate quantity for each auto-refill) than a Tricare beneficiary enrolled in its auto-refill program

needed or was intended to receive by his or her physician, and more frequently than was medically necessary.  Over the course of a year, taking into account the initial fill, each Tricare beneficiary received 73% more pills of each maintenance drug on auto-refill than was originally prescribed.  *See* Exhibit 1.  As shown in the diagram above, this conduct was flagrant and persistent.  It therefore violated 32 C.F.R. § 199.9(c)(5), as well as other state and federal regulations and pharmacy standards.

5.      Express Scripts hid its conduct from DoD and Tricare, causing the United States to purchase additional pharmaceutical products to replenish its prescription drug supply.  Consequently, the United States paid Express Scripts and other vendors billions of dollars in excessive dispensing fees and drug-replacement costs.  As stated on-line by one Tricare beneficiary:  "I HATE this company and cannot believe that military members are forced to use them for maintenance medications.  Their actions are at best negligent and at worst criminal."

6.      Pursuant to the FCA, Relator seeks to recover treble damages and civil penalties on behalf of the United States arising from Express Scripts' fraudulent pharmacy practices.  Relator also seeks to protect U.S. service members and their families, the environment, and the public from the scourge of excess medications.

## II.   PARTIES

7.      Relator 3729, LLC ("Relator") is a limited liability company incorporated in the State of Delaware with a principal place of business in Seattle, Washington.  One of Relator's principals (hereinafter referred to as the "PIC Relator") was the Pharmacist in Charge ("PIC") of Express Scripts' Tempe, Arizona mail-order pharmacy where Tricare prescriptions are processed.  In this capacity, he was personally responsible for all pharmacy activities.  Through his

1   employment at the Tempe location from October 2009 until March 2018, he has
2   first-hand knowledge of how Express Scripts' mail-order pharmacy program
3   operated.  Relator's other principals are senior executives of a technology company
4   and have first-hand knowledge of Express Scripts' member experiences,
5   dispensing, and business practices.  They also have general pharmacy industry
6   expertise.

7          8.      Defendant Express Scripts, Inc. ("ESI") is a wholly-owned subsidiary
8   of Express Scripts Holding Company.  It is incorporated in the State of Delaware
9   with a principal place of business in St. Louis, Missouri.  It is the largest PBM in
10  the United States, providing pharmacy services to over 85 million people
11  nationwide.  Over 68,000 retail pharmacies—representing 98% of all retail
12  pharmacies in the U.S.—participate in its pharmacy network.  ESI also operates
13  retail, mail-order, and specialty pharmacies, including the Tricare mail-order
14  pharmacy located in Tempe, Arizona.  In 2017, ESI had 26,600 employees and a
15  reported revenue of $100 billion.

16         9.      Defendant Express Scripts Holding Company is a publicly-traded
17  company incorporated in the State of Delaware with a principal place of business
18  in St. Louis, Missouri.  It is the holding company for Express Scripts, Inc., and was
19  formed after the 2012 merger of ESI with a close PBM competitor, Medco Health
20  Solutions ("Medco").

21              **III.   JURISDICTION AND VENUE**

22         10.     This is an action brought pursuant to the False Claims Act, 31 U.S.C.
23  § 3279 *et seq.*, and subject matter jurisdiction is invoked pursuant to 28 U.S.C.
24  § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction
25  on this Court for actions brought pursuant to 31 U.S.C. § 3730.

26         11.     This Court has personal jurisdiction over Defendants pursuant to 31
27  U.S.C. § 3732(a), as one or more Defendants can be found in, reside in, transact

28

1  business in, and have committed acts related to the allegations in this Complaint in

2  the Southern District of California and because acts proscribed by 31 U.S.C.

3  § 3279 occurred in this District.

4       12.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and

5  31 U.S.C. § 3732(a).

6              **IV.   FACTUAL AND LEGAL BACKROUND**

7  **A. The Problem of Medication Over-Dispensing**

8       13.    Express Scripts' fraudulent dispensing scheme, as alleged below, is an

9  example of the larger problem of medication over-dispensing by PBMs and

10 pharmacies in the American health care system, which is driving up drug costs for

11 public and private health insurers, as well as for patients.

12      14.    As reported by the National Prescription Coverage Coalition

13 ("NPCC"), a consortium of private health plans that have joined together to

14 improve prescription coverage benefits and decrease prescription coverage costs,

15 "many PBMs are dispensing through their subsidiary pharmacies far more pills

16 than needed, at great cost to the health plans."[1]  NPCC identifies "auto-refills and

17 dispensing date creep" as an underlying cause of this over-dispensing.  This occurs

18 when a PBM places a patient's prescriptions on auto-refill, and then moves up the

19 date on which a full days' supply of the prescription drug is shipped out in order to

20 generate additional revenue in the form of excess prescription deliveries and

21 additional dispensing fees.  This causes patients to receive a far greater quantity of

22 pills than was needed or prescribed.

23

24 _____

25

26 [1]  National Prescription Coverage Coalition, "End Your PBM's Refill Pill Mill"
   (2016), available at: http://nationalprescriptioncoveragecoalition.com/end-your-
27 pbms-refill-pill-mill/.

28

15.    The few audit firms that have examined the practice of auto-refill dispensing date creep "have found that many PBMs violate plans' written refill protocols, with the result that at least 1% to 4% of total drug costs represent over-dispensing." In 2015, total drug spending in the United States was approximately $457 billion.[2] Therefore, the estimated cost from PBM over-dispensing for that year was at least $13.3 billion.

16.    In terms of the sheer volume of excess pills given to patients and potentially diverted or discarded into the environment, the effect of PBM over-dispensing is enormous. By way of example, NPCC notes that during the first four years of a federal government initiative known as the Drug Take-Back Program, individuals "brought back 4.823 million pounds—or 2,411 tons—of unused drugs." NPCC estimates that every pound of returned pills represents approximately 22,679 pills. Therefore, during the first four years of the federal program, individuals turned in "more than 109 billion unused pills on Drug Take-Back Days." The problem is much worse than these calculations suggest, however, because most people don't participate in the federal Drug Take-Back Program.[3]

17.    As the NPCC laments, PBM and pharmacy over-dispensing results in "hills of unused pills" that are "accumulating, polluting our rivers and aquifers, and costing [health plans] immense sums unnecessarily." NPCC pointedly concludes:

---

[2] See HHS, *Observations on Trends in Prescription Drug Spending*, available at: https://aspe.hhs.gov/pdf-report/observations-trends-prescription-drug-spending.
[3] *Id. See also* National Community Pharmacists Association, "Waste Not, Want Not: Examples of Mail Order Pharmacy Waste" (2013) (showing images of excess drugs collected by pharmacies as part of NCPA's drug take-back program), available at:  https://www.ncpanet.org/pdf/leg/sep11/mail_order_waste.pdf.

8

1  "Every PBM should be required to dispense refills wisely.  There's simply no

2  excuse for the excessive dispensing of pills."

3  **B. CMS's Response to Medication Over-Dispensing**

4       18.    Following Congressional hearings in 2011,[4] the Centers for Medicare

5  and Medicaid ("CMS"), which administers the Medicare and Medicaid health care

6  programs, identified PBM and pharmacy auto-refill programs as a significant

7  source of prescription drug over-dispensing, and took steps to address this problem

8  within the Medicare Part D prescription drug program.

9       19.    Specifically, between April 2013 and February 2015, CMS issued a

10  series of Call Letters and other guidance requiring Medicare Part D plan

11  sponsors—the private health insurance companies reimbursed by CMS for

12  providing Part D prescription drug benefits to Medicare beneficiaries—to control

13  fraud, waste, and abuse in the Part D program by restricting PBM and pharmacy

14  "auto-ship refill" programs in several ways.  These restrictions included requiring

15  that patient participation in auto-refill programs be voluntary, with enrollment

16  accomplished on an opt-in basis, and that pharmacies obtain patient consent prior

17  to each delivery, and allow patients to easily opt-out at any time.  CMS also

18  required that Part D plan sponsors closely monitor all grievances and complaints

19  related to mail-order delivery, and confirm at least annually that patients wanted to

20  continue in the program.  The goal of these measures was to eliminate excessive

21  drug dispensing by mail-order pharmacies and thereby reduce Medicare Part D

22  program costs.

23

24  [4] *See The Express Scripts/Medco Merger: Cost Savings for Consumers or More*

25  *Profits for the Middlemen?, Hearing before the Subcomm. on Antitrust,*

26  *Competition Policy and Consumer Rights*, 112 Cong. 266 (Dec. 6, 2011); *Fighting*
   *Fraud and Waste in Medicare and Medicaid, Hearing before a Subcomm. of the*

27  *Comm. On Appropriations*, 112 Cong. 393 (Feb. 15, 2011).

28

20.     In support of these measures, CMS cited to 42 C.F.R. § 423.504, which requires Part D plans to have compliance programs in place that "prevent, detect, and correct noncompliance with CMS's program requirements as well as measures to prevent, detect, and correct fraud, waste, and abuse." CMS, 2014 Advance Notice at 134 (Feb. 15, 2015).[5]

21.     Federal regulations also require Medicare Part D plans to have systems in place to ensure that network pharmacies "comply with minimum standards for pharmacy practices as established by the States," including policies and procedures to ensure that drugs are not dispensed in such a manner as to cause "[o]ver-utilization" of medications. *See* 42 C.F.R. § 423.153(c).

**C. Tricare Prohibitions on Medication Over-Dispensing**

22.     Tricare provides health insurance benefits, including prescription drug coverage, to approximately 9.4 million eligible beneficiaries around the world, including active duty service members, retirees, and their family members and dependents.

23.     Since October 1, 2013, Tricare has been managed by the Defense Health Agency within DoD ("DHA"). Prior to that date, the program was managed by DHA's predecessor agency, the Tricare Management Activity ("TMA").

24.     From approximately 2003 to the present, DoD has contracted with Express Scripts to provide retail, mail-order, and specialty pharmacy services to approximately 10 million Tricare beneficiaries. Pursuant to these contracts, DoD purchased drugs that were then supplied to and dispensed by Express Scripts, which was paid an administrative fee of approximately $17 for each dispensing

---

[5] Available at:  https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtg SpecRateStats/Downloads/ Advance2014.pdf

1   event.  Express Scripts has dispensed hundreds of millions of prescriptions

2   pursuant to these contracts.  For example, in 2017, it dispensed 119,400,000

3   prescriptions to Tricare beneficiaries.

4        25.    Express Scripts and other Tricare providers must take steps to prevent,

5   detect, and correct fraud, waste, and abuse in the Tricare pharmacy program.  *See*

6   32 C.F.R. § 199.21.

7        26.    Tricare regulations define "fraud" to include claims "which involve

8   **flagrant and persistent overutilization of services** without proper regard for

9   results, the patient's ailments, condition, medical needs, or the physician's orders."

10  32 C.F.R. § 199.9(c)(5) (emphasis added).

11       27.    Fraud includes billing Tricare for services that would be covered

12  except for "the frequency" of the services.  *Id.* at § 199.9(c)(2).

13       28.    As a Tricare provider, Express Scripts must adhere to the Tricare

14  Provider Manual, which requires that all entities and individuals serving Tricare

15  beneficiaries comply with all Tricare program regulations, policies, and

16  procedures.[6]

17  **D. State Pharmacy Regulations Prohibit Medication Over-Dispensing**

18       29.    PBMs and pharmacies that do business with the DoD must abide by

19  state pharmacy regulations when providing pharmacy services to Tricare

20  beneficiaries.

21       30.    Express Scripts operates its Tricare mail-order pharmacy program

22  from a facility in Tempe, Arizona, and therefore is subject to Arizona pharmacy

23  regulations.

24

25  _____

26  [6] Available at: https://www.tricare-west.com/content/dam/hnfs/tw/prov/resources/

27  pdf/Op2_HNFS_ Jan2019_West_Prov_Hndbk.pdf.

28

31.     Arizona regulations require pharmacies to conduct a final accuracy check to ensure, among other things, that the dispensation is "consisten[t] with prescription order." Ariz. Admin. Code R4-23-402(A)(11).  The pharmacy must also "[v]erify the legality and pharmaceutical feasibility of dispensing a drug" including on the basis of "the frequency of refills."  Ariz. Admin. Code R4-23-402(A)(5).  Express Scripts' fraudulent scheme interfered with the ability of the Relator PIC and other pharmacists in the Tempe mail-order facility to comply with this regulatory requirement.

32.     In addition, Arizona pharmacies must ensure that medications are dispensed in legal quantities in accordance with the prescriber's orders. *See* Ariz. Admin. Code R4-23-402(A)(10).  Although Express Scripts routinely obtained a renewed prescription for medications on auto-refill to avoid technical violations of this regulation, the manner in which Express Scripts calibrated its dispensing software undermined prescribers' intent.

33.     Express Scripts is also subject to the pharmacy regulations of those states where Tricare beneficiaries reside and Express Scripts dispenses prescription drugs.  Tricare beneficiaries reside throughout the United States and abroad.  Some of these states, including Florida, Montana, Oklahoma, New Hampshire, and Vermont, expressly require pharmacists to prevent over-utilization of drugs.[7]  By

---

[7]  *See, e.g.,* Fla. Admin. Code Ann. 64B16-27.810(1)-(2) ("Pharmacists should prevent over-utilization"); Mont. Admin. R. 24.174.902 ("Pharmacist is required to identify and take steps to avoid over-utilization."); N.H. Admin. Code Ph. 501.01(b)(2) (Pharmacists have a duty to prevent dispensing drugs that "lack therapeutic value" for the patient pharmacy over-dispensing lacks therapeutic value); Okla. Admin. Code 535:10-9-1.2 ("Pharmacist is required to identify and take steps to avoid over-utilization"); Vt. Admin. Code 20-4-1400:10.30 ("Pharmacist is required to identify and take steps to avoid over-utilization").

1  engaging in the fraudulent scheme described below, Express Scripts violated these
2  state pharmacy regulations.

3          **V.   DEFENDANTS' FRAUDULENT CONDUCT**

4      34.    As described below, from at least October 2009—and likely going
5  back to the start of its Tricare contract in 2003—until approximately early 2018,
6  Express Scripts effectively operated a refill "pill mill" by systematically dispensing
7  significantly more pills for each days-supply than a Tricare beneficiary enrolled in
8  its auto-refill program needed or was originally prescribed, and more frequently
9  than was medically necessary.  Express Scripts concealed its conduct from the
10 United States and knowingly submitted false claims to DoD/Tricare for these
11 pharmacy services, resulting in the purchase of billions of dollars in unnecessary
12 medicines and the payment of hundreds of millions of dollars in excess pharmacy
13 and service fees.

14 **A. Express Scripts' Auto-Refill Program Was Fraudulent Because It Caused**
15     **the "Flagrant and Persistent" Over-Utilization of Medications**

16     35.    During the relevant period, pursuant to its contracts with DoD,
17 Express Scripts was permitted, even encouraged, by the United States to enroll
18 Tricare beneficiaries in mail-order pharmacy services, including automatic delivery
19 of non-controlled maintenance prescription drugs.  But Express Scripts was
20 required—and contractually agreed—to offer and perform these pharmacy services
21 in a manner that complied with all relevant state and federal laws, regulations, and
22 guidance, including 32 C.F.R. § 199.9(c), which prohibits the "flagrant and
23 persistent overutilization of services."

24       **i.**    **Express Scripts Calibrated Its Dispensing Software To Over-**
25             **Dispense**

26
27
28

36.    Express Scripts calibrated its pharmacy dispensing software to include two features that resulted in the flagrant and persistent over-utilization of maintenance medications by Tricare beneficiaries.

37.    First, as with virtually all drug benefit programs, Tricare allowed beneficiaries to refill prescriptions for some medications before the prior shipment had been consumed.  To make sure beneficiaries received drugs without interruption, and recognizing that travel and other circumstances might result in a beneficiary not being able to receive an order at his or her home at a certain date, Tricare allowed beneficiaries to request and receive a shipment once a specified period of time had passed – 67% of days-supply (*e.g.,* day 60 of a 90-day prescription period).

38.    Express Scripts exploited this early refill option by incorporating the 67% refill threshold into the logic of its dispensing software.  That is, without an explicit request by Tricare beneficiaries for each prescription, Express Scripts refilled prescriptions for maintenance medications when exactly 67% of the days in the prescription period had elapsed.  Therefore, assuming a 90-day supply of a medication, Express Scripts would send the refill on the 60th day following the prior fill, for another 90-day supply.  *See* Exhibit 1.

39.    Second, ignoring the fact that the initial refill on day 60 of a 90-day supply provided the Tricare beneficiary with an excess of 30-days of medication, *Express Scripts calibrated its dispensing software so that the following refill was again sent before the next 90-day period expired.  And each time a prescription for a maintenance drug was refilled – always on the 60th day – Express Scripts sent not a 60-day but a full 90-day supply.*  Express Scripts did this notwithstanding the fact that at the time of each refill, the Tricare beneficiary still possessed a large and rapidly growing quantity of unused medication.

40.     Therefore, assuming a new Tricare beneficiary with 90-day supply prescriptions placed on auto-refill, and a dosage of one pill per day, Express Scripts dispensed 90 pills for each maintenance prescription on day one.  Then, on day 60, without any explicit request from the beneficiary, Express Scripts automatically refilled each prescription, sending the beneficiary a second 90-day supply.  At this point, the beneficiary had 120 pills (*i.e.,* 180 pills from two fills minus 60 pills presumably used on days 1-60).  In another 60 days, on day 120, again without an explicit request from the beneficiary and knowing that the beneficiary still had 60 pills on hand, Express Scripts sent another 90 pills.  Now the beneficiary had 150 pills (*i.e.,* 270 from three fills, minus 120 presumably used on days 1-120):  90 more than needed before the next refill 60 days later on day 180.

41.     Once the beneficiary's prescription had been fully filled (in a shorter period than the prescriber intended), Express Scripts continued the accumulation pattern by automatically contacting the prescriber to seek a new prescription.  If the prescriber acquiesced to Express Scripts' request, and the beneficiary did not intervene, Express Scripts continued the excessive auto-refilling pattern indefinitely.

42.     Express Scripts neither notified nor sought the permission from Tricare beneficiaries before contacting prescribers to extend prescriptions on auto-refill.  Tricare beneficiaries might not have consented to a new prescription had they been asked because they already had in their possession an excessive supply of pills.

43.     Prescription medications lose their potency over time.  For this reason, state pharmacy boards typically establish a one-year expiration period for most medications.  By the middle of the second year of a 90-day maintenance prescription, the original drugs dispensed by Express Scripts on auto-refill and still

in the beneficiary's possession were expired.  Therefore, by over-dispensing year after year, Express Scripts placed patients at risk of using expired and ineffective medication that patients inadvertently mixed together with non-expired medications.  Depending on the particular drug taken and a patient's condition, the use of such expired drugs can significantly harm a patient's health and well-being.

44.    Without an explicit request, and knowing the beneficiary did not require more pills, Express Scripts sent 90 pills every 60 days.  As illustrated in the diagram above (¶ 4), for each auto-refill of a maintenance drug prescription with 90-day supply, the amount of unused medications the beneficiary had on hand grew by 30 pills.  After one year, a beneficiary had received and still had on-hand, including the first fill, 265 pills, *i.e.,* almost nine months of extra medication.  In two years, the beneficiary had received and presumably was storing in his or her medicine cabinet, or had discarded or given away, an extra year-and-a-half of medication. *See* Exhibit 1.

45.    Express Scripts set up the logic of its mail-order dispensing software in this manner knowing that sending 90 days of medications every 60 days on auto-refill caused an extraordinary level of waste.  Express Scripts also knew that, as a consequence of this practice, Tricare would bear additional and unnecessary costs in the form of extra dispensing fees, claims processing fees, and purchases of additional drugs to replenish the United States' supply.

46.    Express Scripts' auto-refill dispensing practice caused "flagrant and persistent overutilization of services" and was therefore fraudulent, per 32 C.F.R. § 199.9(c)(5).

ii.    **Express Scripts' Auto-Refill Practice Violated Tricare Guidelines and State Pharmacy Regulations and Led to Numerous Patient Complaints**

47.     Express Scripts' excessive dispensing practices violated its obligation to prevent fraud, waste, and abuse in the Tricare program, per 32 C.F.R. § 199.21, as well as various state pharmacy regulations.

48.     For example, on April 7, 2016, Express Scripts signed a Consent Order with the Board of Pharmacy of the State of Oregon (the "Oregon Consent Order"). Pursuant to this settlement, Express Script agreed to pay a penalty of $30,000 and submit to a Quality Assurance plan to address accumulation of refilled prescriptions which are refilled too soon. *See* Oregon Consent Order (Exhibit 2). The Oregon Board of Pharmacy alleged that Express Scripts had engaged in unprofessional practice by *inter alia* refilling prescriptions "out of context with the medication dosage schedule without prescriber authorization," and ignoring patient requests to be removed from the automatic refill program. *See* Notice of Proposed Disciplinary Action (Exhibit 3).

49.     On-line patient complaints about Express Scripts' excessive and unauthorized dispensing practices echo those made by the Oregon Board of Pharmacy and by the Relator. *See* Exhibit 4.

50.     For example, on September 6, 2018, a patient from Akron, Ohio complained: "I opted out of automatic refills because [Express Scripts was] sending them so often I had enough to last me 9 months! They still send me prescriptions I had not yet ordered!" *Id.*

51.     Similarly, on May 17, 2017, a patient from Pittsburgh, Pennsylvania complained: "Express Scripts sends refills too often. They do not wait the required days. This happens over and over. Our home looks like a pharmacy at times. We have removed ourselves from automatic refills and Express Scripts still sends automatic refills. They do not correctly keep track of refills." *Id.*

52.     And on May 12, 2016, another patient who identified herself as a Tricare recipient complained: "Express Scripts NEVER gets orders correct. Over

17

1  the years that we have been forced to use them by Tricare, they have been the

2  single worst company that I've ever dealt with."  Among the many problems she

3  encountered was that Express Scripts "[w]ill not honor your request to stop

4  sending medications."  She concluded: "I HATE this company and cannot believe

5  that military members are forced to use them for maintenance medications.  Their

6  actions are at best negligent and at worst criminal."  *Id.*

7      53.    Neither the Oregon Consent Order nor the many on-line patient

8  complaints address the underlying mechanism, alleged herein by the Relator, by

9  which Express Scripts caused excess maintenance medications to be dispensed to

10 Tricare beneficiaries:  the deliberate calibration of the Express Scripts dispensing

11 software to issue a full days-supply at 67% of usage for each dispensing period

12 throughout the entire life of each prescription on automatic refill.

13      **iii.    Express Scripts Failed to Correct Its Auto-Refill Dispensing**

14           **Software After the Merger with Medco in 2012 to Prevent**

15           **Excessive Dispensing.**

16      54.    According to the PIC Relator, from at least 2009 until approximately

17 2014, Express Scripts used its own proprietary software to dispense prescription

18 drugs.  This software was fully customizable and calibrated to dispense excessive

19 quantities of prescription drugs on auto-refill by employees at the Express Scripts

20 mail-order pharmacy in Tempe, Arizona.  Although the PIC Relator did not

21 become the Pharmacist-in-Charge of the Tempe facility until 2011, he worked

22 directly with these Express Scripts employees and repeatedly raised concerns with

23 them about the manner in which the Express Scripts' dispensing software had been

24 calibrated.  Express Scripts ignored his concerns.

25      55.    In 2014, following the merger of Express Scripts and Medco in April

26 2012, Express Scripts rolled out a new dispensing software called "Foundation 14"

27 (or, simply, "F-14") that was built from the system previously used at Medco

28

1   pharmacies.  The new F-14 dispensing software was deliberately calibrated to

2   carry forward the automatic refill dispensing practice described above that was

3   previously established on the older Express Scripts platform, and was implemented

4   at all Express Scripts pharmacy locations, including at the Tricare mail-order

5   pharmacy in Tempe, Arizona.  The Express Scripts employees involved in the

6   design and implementation of the F-14 dispensing software included:  Paul

7   Plaskon, Senior Manager of Clinical Technology; Eileen Bidell, Director of

8   Clinical Technology; and Eric Smither, Senior Director of Pharmacy Practice

9   Operations.

10      56.    On multiple occasions between 2014 and 2018, the PIC Relator raised

11  concerns with his Express Scripts co-workers and management, including Plaskon,

12  Bidell, and Smither, about the excessive medication dispensed on auto-refill by the

13  F-14 software.  Some of these conversations took place in the context of

14  responding to audits and inquiries from various state Boards of Pharmacy and the

15  DoD, discussed below, which were triggered in part by patient complaints.  The

16  PIC Relator is confident that emails should exist at Express Scripts relating to these

17  conversations.

18      57.    Express Scripts failed to use the merger with Medco in 2012, and the

19  subsequent DoD and state Board of Pharmacy investigations into patient

20  complaints, as an opportunity to correct the calibration of its dispensing software to

21  prevent excessive dispensing of maintenance medications on auto-refill.

22      **iv.    Express Scripts Did Not Give Proper Regard to Patients' Medical**

23      **Conditions**

24      58.    Express Scripts' dispensing software was capable of tracking both the

25  exact number of pills dispensed, and the exact number of days used and remaining

26  on each prescription.  As a PBM, Express Scripts also had records of fills that

27  occurred at retail pharmacies, so it had complete information available from which

28

19

1  to track the total number of pills dispensed to a beneficiary, not just those

2  dispensed by mail.  Therefore, Express Scripts did not give "proper regard" for

3  "results, the patient's ailments, condition, medical needs, or the physician's

4  orders." 32 C.F.R. § 199.9(c)(5).

5      59.    More specifically, Express Scripts' dispensing software employed

6  various "profiles" that dictated when a refill would ship.  Express Scripts placed

7  beneficiaries on different profiles depending, for instance, on the beneficiary's

8  insurer.  Beneficiaries with private insurance were mailed auto-refill medications at

9  the 75% usage date instead of the 67% usage date for Tricare, reducing the

10  financial impact of Express Scripts' over-dispensing practices on private insurers.

11      60.    Express Scripts had actual knowledge that its dispensing software

12  automatically refilled prescriptions at the 67% usage date for each medication, that

13  the refill then sent was for 100% of the prescription period (90 days), and that yet

14  another refill would be sent when only 67% of that refill had been consumed (60

15  days).  In short, Express Scripts knew that its practice was resulting in a rapidly

16  growing quantity of unused and unneeded medication in beneficiaries' medicine

17  cabinets.

18      61.    For the same reasons, Express Scripts' auto-refill practice violated the

19  Arizona pharmacy regulation requiring that pharmacies "[v]erify the legality and

20  pharmaceutical feasibility of dispensing a drug" including on the basis of "the

21  frequency of refills."  Ariz. Admin. Code R4-23-402.

22      62.    Express Scripts also violated state regulations in at least Florida,

23  Montana, Oklahoma, New Hampshire, and Vermont requiring pharmacies to take

24  measures to prevent over-utilization.[8]

25

26  _____

27  [8] *See* supra, n. 7.

28

v.   **Express Scripts Dispensed More Pills on Auto-Refill Than**
     **Patients Needed**

63.   In some circumstances, Express Scripts automatically enrolled Tricare
beneficiary prescriptions in the auto-refill program and required beneficiaries to
*opt-out* if they did not want to continue receiving an excessive supply.  By shifting
the burden onto patients in this manner, Express Scripts made it all but certain that
Tricare beneficiaries would receive medically unnecessary quantities of
maintenance medications.

64.   Specifically, Express Scripts misled Tricare beneficiaries into
enrolling in automatic refill through its online portal.  When a beneficiary ordered
a prescription from the Express Scripts website for mail-order delivery, a pre-
checked box automatically populated on the user's account, enrolling the
beneficiary's maintenance prescription in the auto-refill program.  Beneficiaries
thus had to affirmatively opt-out to avoid receiving automatic refills for these
drugs.  In some instances, this feature caused beneficiaries who had already asked
to discontinue automatic refills to accidentally opt back in the next time they
ordered a prescription using the Express Scripts website.

65.   Express Scripts used other aggressive tactics to enroll Tricare
beneficiaries in the auto-refill pharmacy program.  For example, if a Tricare
beneficiary contacted the Express Scripts customer call center, representatives
would attempt to convince the beneficiary to allow the representative to convert all
of the beneficiary's eligible prescriptions to auto-refill.

66.   Express Scripts' call center employees were financially rewarded for
enrolling Tricare beneficiaries in the auto-refill program.  Specifically, per the PIC
Relator, employees' bonuses were determined in part by the number of
beneficiaries the employee enrolled in auto-refill.

67.     Although Express Scripts made outbound IVR "robocalls" to Tricare beneficiaries prior to refilling mail-order prescriptions, ostensibly to provide beneficiaries with an opportunity to opt-out, these calls were misleading in that they did not tell beneficiaries what medications were being refilled and would sometimes state or imply that Express Scripts had a valid prescription even when it did not.  These robocalls were part of a larger campaign by Express Scripts to bombard beneficiaries with multiple daily calls, causing many individuals to not pick up the phone when Express Scripts' caller ID appeared.  If a beneficiary did not take action in response to a robocall, as many did not, Express Scripts' system defaulted to fill and ship the medication.

68.     In this manner, by early 2018, Express Scripts successfully enrolled approximately 50% of all Tricare maintenance drug prescriptions in its auto-refill program.

69.     By utilizing the above tactics, Express Scripts did not give "proper regard" for each patient's "ailments, condition, medical needs" before enrolling them in the auto-refill program, as required by 32 C.F.R. § 199.9(c)(5).  Its auto-refill practices were therefore fraudulent as defined by federal regulations.

   **vi.    Express Scripts Dispensed More Pills on Auto-Refill Than the Prescribing Physicians Intended**

70.     As a licensed pharmacy, Express Scripts must have a valid prescription on file from an authorized prescriber in order to dispense drugs that are not over-the-counter medications.  *See* Ariz. Admin. Code R4-23-402.  To be valid, a maintenance prescription must contain certain specific information, including the name of the prescriber, the medication, and the number and frequency of pills to be taken.  *Id.*

71.     In most circumstances, it is a simple matter for a pharmacist to calculate the total number of pills to be dispensed on an initial fill or subsequent

refill of a maintenance drug based on the information provided by the authorized prescriber on the prescription, including quantity and doses per day.

72.     Express Scripts' auto-refill practices ignored this pharmacy standard, which, as discussed below, it imposed on its own network pharmacies.  Instead of limiting the number of pills dispensed on auto-refill to the quantity specified by each patient's physician or authorized prescriber based on an assessment of a patient's medical condition, Express Scripts relied on an algorithm embedded in the logic of its dispensing software designed to maximize the number of dispensing fees for each prescription.

73.     As indicated in the diagram above (¶ 4) for a single prescription for a maintenance drug on auto-refill with a 90-day supply, over the course of a year, Express Scripts dispensed far more pills than the prescribing physicians intended.

74.     Express Scripts did not give "proper regard" for "physician's orders" before enrolling Tricare beneficiaries in its auto-refill program, as required by 32 C.F.R. § 199.9(c)(5).   Its auto-refill practices were therefore fraudulent as defined by federal regulations.

75.     For the same reasons, Express Scripts' auto-refill practice also violated Arizona pharmacy regulations requiring pharmacies to conduct a final accuracy check to ensure, among other things, that the dispensation is "consisten[t] with prescription order."  Ariz. Admin. Code R4-23-402(A)(11).  Express Scripts also failed to "[v]erify the legality and pharmaceutical feasibility of dispensing a drug," including on the basis of "the frequency of refills."  Ariz. Admin. Code R4-23-402(A)(5).

**vii.     Express Scripts Was Financially Motivated to Dispense Excess Drugs**

76.     DoD/Tricare paid Express Scripts an administrative fee of approximately $17 each time it dispensed a drug through mail-order delivery to a Tricare beneficiary.

77.     Because of the vast number of beneficiaries enrolled in the Tricare pharmacy program—approximately 9.4 million beneficiaries in 2018—and the even larger number of prescriptions processed,[9] even a slight increase in the number of dispensing events per prescription had the potential to dramatically increase Express Scripts' total revenue from the Government.

78.     Based on public filings, Express Scripts took title to the drugs dispensed to Tricare beneficiaries and therefore was able to book revenue (not just fees) from each dispensing event.  Therefore, the more drugs Express Scripts dispensed to Tricare beneficiaries, the greater its profit margins.

79.     For this reason, Express Scripts carefully tracked the number of Tricare beneficiaries and prescriptions enrolled in the auto-refill program, as well as the frequency and total number of dispensing events.  This data was collected and analyzed at the direction of Dylan Fondry, Express Scripts' Senior Director of Value Management, who worked in Express Scripts' Tempe, Arizona facility.

---

[9] According to Tricare's website, it provides coverage to almost 9.4 million beneficiaries worldwide (not broken down into number enrolled in pharmacy program specifically) [https://www.tricare.mil/About/Facts/BeneNumbers (1/2019)], and fills on average 2,288,296 prescriptions a week (number further broken down by military facilities, network pharmacies, home delivery, and T for Life) [https://www.tricare.mil/About/Facts/PatientCareNumbers (1/2019)]. According to the pharmacy handbook, the pharmacy program provides prescription drugs to more than 9.4 million individuals through ESI [https://tricare.mil/~/media/Files/TRICARE/Publications/Handbooks/ Pharmacy_HBK.ashx (4/2019)].

80.     Significantly, Fondry prepared both retrospective and prospective calculations of Express Scripts' revenue based on auto-refill financial data. Fondry's reports were provided to Express Scripts' senior management in St. Louis on a monthly and annual basis for their use in volume and financial forecasting.

81.     To increase its revenue further, Express Scripts aligned its employees' personal financial incentives with its own corporate interests by basing employees' bonuses in part on their success rate in enrolling Tricare beneficiaries in the auto-refill program.

82.     Express Scripts and its employees were therefore financially motivated to dispense excessive quantities of maintenance drugs through its auto-refill program.

**B. Express Scripts Concealed Its Auto-Refill Dispensing Practices From the United States**

83.     Express Scripts' fraudulent scheme would not have been successful if it had been easily detectable by the United States.

84.     Express Scripts' scheme was not easily detectable because, although the aggregate effect of the scheme was enormous (both in terms of the costs to DoD for dispensing fees and to replace the United States' drug supply), for any particular prescription, the actual amount of fraudulent billing to DoD/Tricare was relatively small:  two extra dispensing fees for each 90-day supply maintenance drug over the course of a year. *See* Exhibit 1.

85.     Moreover, until recently, beneficiaries did not have to make co-payments for generic medications under the Tricare formulary.  Beneficiaries therefore lacked any financial motivation to "make noise" about receiving excess medications by filing a formal complaint with Express Scripts or DoD.  Instead, for the most part, Tricare beneficiaries simply stockpiled or discarded the extra volume of pills that Express Scripts mailed to them.

25

86.     But Express Scripts was not entirely passive in concealing its
fraudulent auto-refill practices from the United States.  As described below,
Express Scripts pro-actively ignored or failed to report critical information to DoD
and Tricare that would have enabled the United States to address Express Scripts'
fraudulent scheme sooner.

### i.     Some Employees Raised Concerns Internally About Express Scripts' Auto-Refill Practices

87.     Express Scripts' management was aware its auto-refill practices were
improper and caused significant over-utilization of maintenance drugs.

88.     Specifically, in or around late 2016, the PIC Relator, who was greatly
disturbed by the effects of the refill software logic, discussed Express Scripts'
auto-refill practices with Doug Lang, Express Scripts' Vice President of Pharmacy
Compliance.  Mr. Lang, himself a pharmacist and a member of the Board of
Pharmacy for Missouri, told the PIC Relator that he was also worried about the
excess medications that Express Scripts was generating by its auto-refill practices,
and had made efforts to stop it.

89.     The PIC Relator spoke with other mid-level managers at Express
Scripts, including his peers in pharmacy practice, directors in operations, and
partners in regulatory compliance.  For example, as discussed above, during the
course of responding to DoD and state Board of Pharmacy inquiries, he had
multiple conversations with Eileen Bidell and Paul Plaskon about the refill logic of
the F-14 dispensing software.  During these conversations, some of which were
recorded in emails, he observed that Express Scripts' refill practices were overly
aggressive and should not have been instituted.  The PIC Relator's peers agreed
that Express Scripts' dispensing practices were causing a great deal of medication
waste.

90.     Despite this widespread concern within the company, Express Scripts never discussed the excess medications dispensed on auto-refill with DoD/Tricare and at best "recklessly disregarded" or "deliberately ignored" the fraudulent nature of its auto-refill practice.

ii.     **Express Scripts Ignored Some Patient Complaints**

91.     As required by the DoD/Tricare pharmacy contracts, Express Scripts operated a call center in Tempe, Arizona to handle requests and complaints from Tricare beneficiaries related to the pharmacy program.

92.     According to the PIC Relator, the Express Scripts call center records all complaints that come in and uses data analytics to track Tricare beneficiary issues and gauge employee performance.

93.     During the relevant period, some Tricare beneficiaries called Express Scripts' call center and asked to be removed from the auto-refill program and/or complained about receiving excess drugs.  Nevertheless, according to the PIC Relator, requests by some of these Tricare beneficiaries were ignored and they continued to receive medications on auto-refill.

iii.    **Express Scripts Failed to Reveal Its Fraudulent Dispensing Practices During the DoD Inspector General Audit in 2013/14**

94.     Express Scripts concealed its fraudulent pharmacy practices from the DoD during an audit performed by the DoD Inspector General in 2013/14.  *See* Department of Defense Inspector General, Report No. DODIG-2013-108: *The TRICARE Mail Order Pharmacy Program Was Cost Efficient and Adequate Dispensing Controls Were in Place* (2013).[10]

---

[10] Available at:  https://media.defense.gov/2013/Jul/24/2001712904/-1/-1/1/DODIG-2013-108.pdf.

27

95.     The audit was conducted in response to a Congressional request that the DoD Inspector General assess the impact of Tricare's increased usage of mail-order pharmacy services.  Congress wanted to know whether Tricare's shift from retail to mail-order pharmacy services was saving the Government money and if appropriate controls were in place to reduce waste.

96.     The DoD Inspector General audit was not a surprise to Express Scripts' management.  Instead, the Inspector General gave Express Scripts significant lead time to prepare for the audit.  The PIC Relator participated in Express Scripts' preparations and response to the audit at the Tempe facility.

97.     Based on the PIC Relator's first-hand knowledge, Express Scripts' overall approach to the DoD Inspector General audit was to "go on the offensive" and emphasize the methods a Tricare beneficiary could use to "opt-out" of the auto-refill program and stop receiving pills by mail delivery.

98.     The PIC Relator does not recall Express Scripts making any mention to the DoD IG auditors about the calibration of Express Scripts' dispensing software to increase the frequency of dispensing events, or that the auto-refill program was resulting in Tricare beneficiaries receiving a quantity of pills for each maintenance prescription that was far in excess of what was medically necessary and originally prescribed.

99.     The PIC Relator also does not recall the auditors using prescription data or other information from Express Scripts to "drill down" on key issues relating to over-dispensing of maintenance medications in any meaningful fashion.

100.    Instead, as for other routine audits, the PIC Relator recalls the DoD IG auditors focusing on instances where Express Scripts had billed for very large quantities of drugs in a very short period of time (*e.g.,* seven refills in 90-days) for a single beneficiary.  The auditors were looking for extreme anomalies in Express Scripts' pharmacy practice, not everyday dispensing patterns.

101.   The DoD Inspector General audit report is consistent with Relator's recollections, and attributes a number of false and misleading statements to Express Scripts that help explain why the fraudulent scheme alleged by Relator was not detected.

102.   First, the scope of the audit was very narrow.  It was limited to the time-period December 2012 to July 2013 and focused on "selected aspects" of Express Scripts' mail-order pharmacy program, specifically, the aggregate cost of the mail-order program compared to retail pharmacy services.  Similarly, the report makes clear that the auditors did not address Express Scripts' dispensing practices with respect to individual prescriptions.  The auditors did "not review patient utilization of their medications."  The auditors also made clear that they did not examine the "quantities or dollar amounts listed in [Express Scripts' prescription reports for CY 2012] and cannot attest to their accuracy."

103.   Second, the report indicates that Express Scripts withheld information from the auditors that might have tipped them off to over-dispensing on auto-refills.  Specifically, the report states that the IG auditors "attempted to obtain information" on waste resulting from "delivered, unneeded prescription medications."  But Express Scripts "could not provide data related to this type of waste."  According to the PIC Relator, in fact, this information and data was available to Express Scripts at the time of the audit.  Managers simply decided that it should not be produced.

104.   Third, the report states that Express Scripts had "designed controls . . . to ensure beneficiaries received only necessary pharmaceuticals" but does not explain the basis for this assertion.  There is no indication that the auditors evaluated the logic of Express Scripts' dispensing software or reviewed a statistical sample of auto-refilled prescriptions.

105.   Finally, the audit report provides no support for the claim that, unless a Tricare beneficiary requested a cancellation, Express Scripts "would process the refills based on when their previous fill would run out."  In light of the PIC Relator's first-hand knowledge that Express Scripts actually processed refills based on a pre-set 67% days-supply schedule, regardless of when a Tricare beneficiary's actual drug supply would "run out," this statement is false.  It was most likely generated by Express Script managers to deflect Government attention from Express Scripts' fraudulent auto-refill pharmacy practices.

**C. Express Scripts Failed to Reveal Its Fraudulent Dispensing Practices In Response to DoD Inquiries About Seven Tricare Beneficiaries in 2015**

106.   In or around 2015, the DoD contacted Express Scripts and raised concerns about seven specific Tricare beneficiaries who had received excessive quantities of maintenance prescription medications.  The DoD wanted to know how and why these patients had received their medications too soon and in larger quantities than medically necessary or appropriate.

107.   The PIC Relator worked with several key individuals at the Tempe facility to gather and analyze the prescription records of these seven Tricare beneficiaries:  Beth Stalker, Pharmacy Technician; Vicki Delaney, Quality Audit Lead Pharmacist; and Michael Shilling, Clinical Staff Pharmacist, Member Response Team.  The PIC Relator also asked Stalker and Delaney to examine the underlying refill logic of the dispensing software so that he could understand why and how the alleged problems occurred.  The PIC Relator is confident that emails and documents should exist at Express Scripts relating to these communications.

108.   Approximately sixty days before the visit of the DoD auditors, the PIC Relator participated in a teleconference with representatives from DoD/Tricare at which the dispensing records of the seven Tricare beneficiaries was addressed.

1       109.  During this teleconference, and throughout the investigation

2   generally, the DoD investigators did not inquire about the underlying logic of the

3   F-14 dispensing software.  Significantly, the Express Scripts employees attending

4   the meeting omitted telling the DoD investigators that one possible cause of the

5   excess dispensing was how the F-14 software had been calibrated.  The DoD

6   investigators were deflected to other aspects of Express Scripts' dispensing

7   practice and did not impose any penalties.

8   **D. ESI Quietly Ended the Routine Oversupply of Medication Fearing**

9        **Growing Customer Complaints and Scrutiny**

10       110.  In late 2017 or early 2018, after years of knowingly operating a refill

11   pill mill, and spurred by the penalties imposed by the Oregon Board of Pharmacy

12   (*see supra* ¶ 48), Express Scripts finally changed the logic of its dispensing

13   software.  Under the new logic, Express Scripts no longer auto-refills every 60

14   days on 90-day prescriptions for maintenance drugs.  Instead, only the first refill

15   ships at day 60 of a 90-day supply.  This ensures that the beneficiary receives one

16   refill before the beneficiary has used the entire initial prescription, essentially

17   creating a buffer.  However, under the new logic, the second refill and all

18   subsequent refills ship out on day 90 of a 90-day supply.  *See* Exhibit 5.

19       111.  Using the standard 90-day maintenance medication supply as an

20   example, Express Scripts' new logic ships an initial prescription at calendar day

21   one, the first refill at calendar day 60, the next at calendar day 150 (90, not 61,

22   days thereafter), then another at calendar day 240 (90, not 61 days, thereafter), and

23   so on.

24       112.  Therefore, after the policy shift, Express Scripts reduced the number

25   of auto-refills it dispensed over the course of a year on a 90-day supply

26   prescription from six to four, or 365 pills instead of 630 for a 365-day period.  The

27   new dispensing practice eliminated the problem of excess dispensing and could

28

1  have been implemented by Express Scripts when it began providing mail-order
2  pharmacy services to Tricare beneficiaries.

3       113.   Corporate executives at Express Scripts' highest levels were involved
4  in or otherwise aware of the policy shift in auto-refill dispensing logic for Tricare
5  beneficiaries.  Express Scripts' Chief Executive Officer Timothy Wentworth
6  announced the policy shift on an internal quarterly leadership call in late 2017 or
7  early 2018.  The Relator PIC participated in the call.

8       114.   Express Scripts appears to have knowingly changed its auto-refill
9  practices to avoid detection.  Effective February 1, 2018, the Tricare program
10  increased beneficiary co-payment responsibility.  For a 90-day supply of generic
11  formulary drugs delivered by mail, beneficiary co-pays increased from $0 to $7 per
12  fill.  From its experience as a mail-order pharmacy, Express Scripts knew that
13  beneficiaries with some co-payment responsibility are much more likely to
14  complain about receiving excess medication.  Express Scripts likely changed its
15  auto-refill practices because it anticipated that more Tricare beneficiaries would
16  file complaints once the increased co-payments went into effect, potentially tipping
17  off DoD/Tricare auditors.

18       115.   After Express Scripts changed its auto-refill dispensing logic, Tricare
19  beneficiaries still had access to sufficient quantities of the medications enrolled in
20  auto-refill.  To Relator's knowledge, beneficiaries did not complain about a lapse
21  in access to medication under the new policy, further underscoring that Express
22  Scripts' auto-refill dispensing practices during the relevant period served no
23  legitimate purpose.

24  **E. Express Scripts' Dispensing Practices Contrasted with How it Treated Its**
25     **Own Network Pharmacies**

26
27
28

116.   Express Scripts' own conduct when it has stood in the shoes of the drug-payer demonstrates that it knew that its Tricare auto-refill practices violated industry and government pharmacy standards.

117.   Specifically, on the commercial side of its business, Express Scripts, acting as a PBM—a business whose ostensible purpose is to keep drug dispensation costs down—has terminated hundreds of pharmacies for engaging in actions that Express Scripts claimed constituted fraud, waste, and abuse.

118.   When serving as a PBM, Express Scripts closely monitors the amounts of drugs its network providers dispense.  Express Scripts reserves broad authority to audit all claims and to investigate any suspected fraud, waste, or abuse. In response to a request from Express Scripts, any pharmacy operating in its network must provide all requested information, including documentation of all refills and the prescription that supports the refill.  Additionally, Express Scripts uses its proprietary programs to evaluate all claims and identify claims for further review. As part of its selection criteria, it considers the quantity of drugs dispensed.

119.   Through its audits, Express Scripts identifies "discrepancies" for which it demands repayment.  For instance, Express Scripts considers a claim discrepant if a network provider submits a claim for a refill in excess of the number of fills indicated on the original prescription, *i.e.,* an "unauthorized refill."  It also considers a claim discrepant where the quantity of drugs exceeds the amount written on the prescription or the days' supply submitted by the pharmacy, *i.e.,* an "overbilled quantity."  And Express Scripts' software issues a "Refill Too Soon" (RTS) alert if a network pharmacy attempts to auto-refill a prescription earlier than allowed.  Claims submitted by a pharmacy despite an "RTS" error are rejected.

120.   For any claim it deems discrepant, Express Scripts retains the right to recoup funds paid to the network pharmacy, or to take other corrective action including termination.

121. Express Scripts' dual roles within the pharmaceutical industry evinces its understanding of industry norms and is further evidence that Express Scripts knew its dispensation scheme resulted in improper overutilization.

**F. Express Scripts' Dispensing Practices Resulted in Enormous Damages to the United States**

122. The magnitude of the waste and damage to Tricare is immense. According to the DoD Inspector General, in 2012, Express Scripts filled 35% of 16.9 million mail-order prescriptions by auto-refill. This represents 5.9 million prescriptions on auto-refill in 2012. Assuming the fee to Express Scripts for each refill was approximately $17, and an average of seven fills per prescription per year, Tricare paid $702 million to Express Scripts for auto fills in 2012. Therefore, between 2009 and 2017, Express Scripts was paid approximately $6.3 billion in dispensing fees, at least $1.8 billion of which (28.57%)[11] was for excessive and medically unnecessary fills.

123. The United States was also damaged by the costs associated with replenishing DoD's supply of prescription drugs that were transferred to Express Scripts for providing pharmacy services to Tricare beneficiaries. Assuming a typical maintenance drug dispensed to a Tricare beneficiary costs DoD $99 per fill, and was dispensed seven times per year, the total cost of the oversupply in 2012 was $1.2 billion. Therefore, between 2009 and 2017, the total cost of replenishing DoD's prescription drug supply was in the billions of dollars.

124. Express Scripts' scheme caused Tricare additional damages in the amount the Government paid to acquire the excess drugs shipped to beneficiaries.

---

[11] Assuming an average of two extra fills out of seven fills per prescription per year. *See* Exhibit 1.

34

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## VI.   CAUSES OF ACTION
### COUNT I
### False Claims Act
### 31 U.S.C. § 3729(a)(1)(A-B)

125.   Relator alleges and incorporates by reference the allegations made in Paragraphs 1 through 124 of this Complaint.

126.   This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. §§ 3729-32.

127.   By virtue of the acts described above, Defendants knowingly submitted or caused to be submitted to the United States Government false or fraudulent claims for payment under its TRICARE contracts that did not qualify for payment.  Each of these requests for payment constitutes an actionable false claim under the False Claims Act.

128.   Through the acts described above and otherwise, the Defendants, and their agents and employees, knowingly made, used, and/or caused to be made or used false records and statements in order to get such false and fraudulent claims paid and approved by the United States Government.  These records and statements include but are not limited to Defendants' submissions of claims for dispensing fees and replenishment of drug supply related to pharmacy services provided to the seven Tricare beneficiaries who were the subject of the DoD/Tricare investigation in or around 2015, and multiple state Board of Pharmacy investigations.

129.   The United States, unaware of the falsity of the records, statements, or claims made by the Defendants, paid the Defendants and drug suppliers for claims that would otherwise not have been allowed.

130.   By reason of these payments, the United States Government has been damaged in the amount of billions of dollars.

**PRAYER FOR RELIEF**

**WHEREFORE**, Relator prays for judgment against Defendants as follows:

131.   That Defendants cease and desist from violating 31 U.S.C. § 3729 *et seq.*;

132.   That the Court enter judgment against Defendants in an amount equal to three times amount of damages the United States has sustained as a result of Defendants' actions, as well as civil penalties against Defendants of $21,916 for each violation of 31 U.S.C. § 3729 *et seq.*;

133.   That Relator be awarded all costs and expenses of this action, including attorney's fees, litigation expenses, and post-judgment interest;

134.   That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d); and

135.   That the United States and Relator receive all such other relief as the court deems just and proper.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands trial by jury.

DATED: June 26, 2019

Respectfully submitted,
**CONSTANTINE CANNON LLP**

Wayne T. Lamprey
Email: wlamprey@constantinecannon.com
Hallie E. Noecker
Email: hnoecker@constantinecannon.com
150 California St., 16th Floor
San Francisco, CA 94111
Telephone: (415) 639-4001

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Edward A. Baker
Email: ebaker@constantinecannon.com
1001 Pennsylvania Ave., N.W.
Suite 1300N
Washington, D.C. 20004
Telephone: (202) 204-3500

Matthew L. Cantor
Email: mcantor@constantinecannon.com
335 Madison Ave., 9th Floor
New York, NY 10017
Telephone: (212) 350-2700

Attorneys for Plaintiff-Relator