David J. Chizewer (*pro hac vice*, IL Bar No. 6206747)
Roger A. Lewis (*pro hac vice*, IL Bar No. 6229704))
Benjamin W. Chertok (*pro hac vice pending*, IL Bar No. 6335682)
GOLDBERG KOHN LTD.
55 East Monroe Street – Suite 3300
Chicago, Illinois 60603
(312) 201-4000
david.chizewer@goldbergkohn.com
roger.lewis@goldbergkohn.com
benjamin.chertok@goldbergkohn.com

Ross H. Hyslop (CSB #149358)
PESTOTNIK LLP
501 West Broadway – Suite 1025
San Diego, California 92101
(619) 237-3000
hyslop@pestotnik.com

*Counsel for Plaintiff-Relator*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

**THE UNITED STATES OF AMERICA,** *ex rel.* **3729, LLC,**

Plaintiff-Relator,

vs.

**EXPRESS SCRIPTS HOLDING COMPANY and EXPRESS SCRIPTS, INC.**

Defendants.

**Case No. 3:19-cv-01199-TWR-WVG**

**PLAINTIFF-RELATOR 3729, LLC'S RESPONSE IN OPPOSITION TO MOTION TO DISMISS**

**Date:** **March 2, 2023**
**Time:** **1:30 p.m.**
**Location:** **Courtroom 3A, 3rd Floor Edward J. Schwartz United States Courthouse 221 W Broadway San Diego, CA 92101**

Hon. Todd W. Robinson

Complaint Filed: June 26, 2019

# TABLE OF CONTENTS

**Page**


INTRODUCTION ........................................................................ 1

STATEMENT OF FACTS ........................................................................ 3

I. The Complaint ........................................................................ 3

II. The "Public Disclosures" Alleged by Defendants ........................................ 6

LEGAL STANDARDS ........................................................................ 7

ARGUMENT ........................................................................ 7

I. The Public Disclosure Bar Does Not Apply. ........................................ 8

A. The Relator's allegations were never publicly disclosed. ........................ 8

1. The *Army Times* article did not disclose the nature or degree of ESI's fraud, or infer fraud at all. ........................................ 9

2. The Federal Register did not make any disclosures that would lead to the inference of the same or similar fraud. ........................................ 11

B. Even if the public disclosure bar were applicable—which it is not—Relator qualifies as an original source. ........................................ 12

1. LLCs like Relator can be original sources. ........................................ 13

2. Relator's Complaint provides material additions to the previous disclosures. ........................................ 15

3. Government Disclosure ........................................ 16

II. The Complaint adequately pleads the Required Elements of an FCA Claim. ........................................ 17

A. Relators have adequately pleaded falsity under the FCA. ........................ 17

B. Relators have adequately pleaded materiality under the FCA. ............... 22

C. Relators have adequately pleaded that ESI acted with scienter under the FCA. ........................................ 23

CONCLUSION ........................................................................ 25

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Abrahim & Sons Enters. v. Equilon Enters., LLC*,
292 F.3d 958 (9th Cir. 2002)....................13

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................7

*Ebeid ex rel. United States v. Lungwitz*,
616 F.3d 993 (9th Cir. 2010)....................7

*Eminence Cap., LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003)....................7

*Fed. Recovery Servs., Inc. v. United States*,
72 F.3d 447 (5th Cir. 1995)....................15

*Gen. Dynamics Corp. v. United States*,
410 F.2d 404 (Ct. Cl. 1969)....................24

*Hooper v. Lockheed Martin Corp.*,
688 F.3d 1037 (9th Cir. 2012)....................25

*Kellogg Brown & Root Services, Inc. v. United States*,
728 F.3d 1348 (Fed. Cir. 2013)....................19, 22, 24

*Mark ex rel. United States v. Shamir USA, Inc.*,
No. 20-56280, 2022 WL 327475 (9th Cir. Feb. 3, 2022)....................12

*Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*,
276 F.3d 1032 (8th Cir. 2002)....................14, 15

*Nayab v. Cap. One Bank (USA), N.A.*,
942 F.3d 480 (9th Cir. 2019)....................17

*Silbersher v. Valeant Pharms. Int'l, Inc.*,
445 F. Supp. 3d 393 (N.D. Cal. 2020)....................17

*United States ex rel. Bly-Magee v. Premo*,
333 F. App'x 169 (9th Cir. 2009)....................20

*United States ex rel. Branch Consultants, L.L.C. v. Allstate Ins. Co.*,
668 F. Supp. 2d 780 (E.D. La. 2009)....................13, 15

*United States ex rel. Campie v. Gilead Scis., Inc.*,
862 F.3d 890 (9th Cir. 2017)....................19

*United States ex rel. CKD Project, LLC v. Fresenius Med. Care Holdings, Inc.*,
551 F. Supp. 3d 27 (E.D.N.Y. 2021), *aff'd* 2022 WL 17818587 (2d Cir. Dec. 20, 2022)....................15, 16

*United States ex rel. DeFatta v. United Parcel Serv., Inc.*,
771 F. App'x 735 (9th Cir. 2019) .......... 18, 20

*United States ex rel. Found. Aiding the Elderly v. Horizon W., Inc.*,
265 F.3d 1011 *amended by* 275 F.3d 1189 (9th Cir. 2001) .......... 9

*United States ex rel. Hagood v. Sonoma Cnty. Water Agency*,
929 F.2d 1416 (9th Cir.1991) .......... 25

*United States ex rel. Hartpence v. Kinetic Concepts, Inc.*,
44 F.4th 838 (9th Cir. 2022) .......... 24

*United States ex rel. Hastings v. Wells Fargo Bank, NA, Inc.*,
656 F. App'x. 328 (9th Cir. 2016) .......... 16

*United States ex rel. Hendow v. Univ. of Phoenix*,
461 F.3d 1166 (9th Cir. 2006) .......... 19

*United States ex rel. Jahr v. Tetra Tech EC, Inc.*,
No. 13-cv-03835-JD, 2022 WL 2317268 (N.D. Cal. June 28, 2022) .......... 9, 11

*United States ex rel. Lee v. Corinthian Colls.*,
655 F.3d 984 (9th Cir. 2011) .......... 7

*United States ex rel. Mateski v. Raytheon Co.*,
816 F.3d 565 (9th Cir. 2016) .......... passim

*United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*,
812 F.3d 294 (3d Cir. 2016) .......... 13

*United States ex rel. O'Neill v. Somnia, Inc.*,
339 F. Supp. 3d 947 (E.D. Cal. 2018) .......... 20

*United States ex rel. Precision Co. v. Koch Indus., Inc.*,
971 F.2d 548 (10th Cir. 1992) .......... 15

*United States ex rel. Springfield Terminal Ry. Co. v. Quinn*,
14 F.3d 645 (D.C. Cir. 1994) .......... 9, 13, 15

*United States ex rel. STF, LLC v. Vibrant Am., LLC*,
No. 16-cv-02487-JCS, 2020 WL 4818706 (N.D. Cal. Aug. 19, 2020) .......... 14

*United States ex. rel. Whatley v. Eastwick Coll.*,
657 F. App'x. 89 (3d Cir. 2016) .......... 20

*United States v. Bollinger Shipyards, Inc.*,
775 F.3d 255 (5th Cir. 2014) .......... 25

*United States v. McKesson Corp.*,
No. 19-cv-02233-DMR, 2020 WL 4805034 (N.D. Cal. Aug. 18, 2020) .......... 21

*United States v. N. Am. Health Care, Inc.*,
173 F. Supp. 3d 943 (N.D. Cal. 2016) .......... 16

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,

579 U.S. 176 (2016) ....................22, 23

*Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108 (9th Cir. 2020) *cert. denied*, 141 S. Ct. 1380 (2021)....18, 19, 20

**Statutes**

1 U.S.C.A. § 1 ....................14

31 U.S.C. § 3729(b)(1)(A) ....................24

31 U.S.C. § 3730(e)(4) ....................8

31 U.S.C.A. § 3729(a) ....................14

31 U.S.C.A. § 3730(e)(4) ....................8, 15, 16, 17

**Rules**

Fed. R. Civ. P. 12(b)(6) ....................7

Fed. R. Civ. P. 9(b) ....................2, 7

**Regulations**

32 C.F.R. § 199.21 (2018) ....................3, 18

32 C.F.R. § 199.9(c) (2020) ....................3, 18, 20

Ariz. Admin. Code § R4-23-402(A) ....................18

CHAMPUS/TRICARE: Refills of Maintenance Medication Through Military Treatment Facility Pharmacies or National Mail Order Pharmacy Program, 81 Fed. Reg. 76307-01, 76,309 (Nov. 2, 2016) (to be codified at 32 C.F.R. pt. 199) ....................7

# INTRODUCTION

The False Claims Act ("FCA") was designed for cases just like this one. One of the biggest companies in the United States, Express Scripts, Inc. ("ESI"), treated the nation's veterans and active military members for years not as people deserving of responsible and appropriate healthcare, but as marks for its own massive and unlawful profit scheme. The taxpayers of this country—via the Department of Defense ("DoD")—bestowed a well-deserved benefit (Tricare) on military personnel and veterans, which DoD entrusted to ESI as caretaker: to provide and fill prescriptions. Instead, ESI exploited this trust for its own profit.

Specifically, ESI illegally over-dispensed prescription refills and over-charged DoD on a systematic, nation-wide basis (indeed, world-wide), providing *265 days per year of extra, unneeded medication—an extra 73%—for every prescription in ESI's enormous auto-refill program*. For no conceivable reason other than greed, ESI set its auto-refill program to refill prescriptions *every 60 days on 90-day prescriptions* (or 20 days on 30-day prescriptions), not just for the first refill but for *every subsequent refill*, such that the "buffer" of excess medication grew larger with each increasingly premature refill. Through this unlawful program, ESI charged DoD billions-of-dollars in excess dispensing fees and unnecessary drug resupplies, and in the process deprived military personnel and veterans of funds desperately needed for other services.

None of this is hyperbole. In fact, ESI intentionally targeted the Tricare program for its outrageous conduct. When ESI acted as a pharmacy benefit manager ("PBM") for *other* large groups of insureds (*e.g.*, when ESI was dealing with private insurers, not the government), it did *not* permit its own mail-order pharmacy, or any other pharmacy, to make continuous 60-day renewals on 90-day prescriptions as it did under the Tricare program. ESI knew that this practice systematically and improperly results in an ever-increasing and costly over-supply of medication. But ESI spotted a way to bill DoD for this inexcusable

waste and jumped on it.

In response to the Complaint, ESI and its parent company, Express Scripts Holding Company ("ESHC" and together, "Defendants"), have filed a Motion to Dismiss ("Motion," ECF No. 55) that attempts to deflect attention from ESI's unlawful conduct, but misstates the allegations in the Complaint and the law.

No media source or government report disclosed ESI's fraudulent scheme before the Complaint was filed so as to bar it under the FCA's public disclosure rule. A short 2013 article in a military publication, the *Army Times*, reported on poor customer experiences with ESI's mail-order services, including a single instance of a Tricare recipient receiving too much medication from ESI's auto-refill program. The 2014 Federal Register contained only vague comments about waste in the program. Neither of these sources disclosed the scheme alleged in the Complaint, the specific intent behind it, or ESI's cover-up, which defrauded the government of billions through wrongful calibration of ESI's auto-refill system. Even if there was a public disclosure, Relator 3729, LLC (the "Relator"), a limited liability company comprised of individuals with independent, direct knowledge of ESI's fraud (including the former pharmacist-in-charge of ESI's mail-order pharmacy at the center of the scheme), easily satisfies the FCA's "original source" exception to the public disclosure rule.

Moreover, the Complaint is replete with specific allegations required by Fed. R. Civ. P. 9(b) detailing how ESI's claims for reimbursement were false, intentional, and critical to the government's decision to pay. Indeed, this case is the reason for the FCA: to root out brazen frauds on the government like ESI's, and to incentivize brave whistleblowers like Relator and its principals to report them. The Complaint must go forward to correct ESI's grave injustice.[1]

[1] Relator does not object to the dismissal, without prejudice, of ESHC based on Defendants' claim that "ESHC is a holding company with no employees or operations and it is incapable of engaging in any conduct." ECF No. 55-1 at 24. Relator reserves the right to test that claim in discovery.

## STATEMENT OF FACTS

### I. THE COMPLAINT

In or around 2003, DoD, through its Tricare Management Authority and later its Defense Health Agency ("DHA"), first contracted with ESI to provide retail, mail-order, and specialty pharmacy services to approximately 10 million Tricare beneficiaries. *See* Compl. ¶¶ 23-24. Since then, pursuant to its contractual obligations, DoD purchased medications supplied to—and dispensed by—ESI, which received approximately $17 per dispensing event. *Id*. The scale of ESI's dispensing under the Tricare program has been massive, totaling 119,400,000 prescriptions in 2017 alone. *Id*.

Given its size, the prevention of fraud, waste, and abuse in a taxpayer-funded program like Tricare is paramount. To that end, as caretaker of Tricare's pharmacy program, ESI has been required to adhere to an array of federal and state laws, regulations, and contract terms meant to ensure a careful and efficient medication delivery program. These mandates require ESI to take steps to prevent, detect, and correct fraud, waste, and abuse in the Tricare pharmacy program, *id*. ¶ 25 (citing 32 C.F.R. § 199.21 (2018)), including "*flagrant and persistent overutilization of service* without proper regard for … medical needs, or the physician's orders." *Id.* ¶ 26 (citing 32 C.F.R. § 199.9(c)(2)) (emphasis in original). *See also infra* Argument § II(a).

ESI ignored all of these requirements. *See* Compl. ¶¶ 36-46. Instead, knowing it would collect a fee each time it dispensed medication, ESI generated as many dispensing events as possible by establishing an automated shipping program meticulously designed to send unnecessary surpluses of drugs all over the globe to Tricare beneficiaries, causing the United States to spend billions on unnecessary fees and supplies. *Id*. ¶¶ 2-5, 34, 122.

One of the individuals with inside knowledge of ESI's fraud was the Pharmacist in Charge (the "PIC") of ESI's Tempe, Arizona mail-order pharmacy,

who was responsible for all pharmacy activities between 2011 and 2018, and was employed at the facility since 2009. *Id.* ¶¶ 7, 54. In that capacity, the PIC, one of the principals of Relator, acquired first-hand knowledge of precisely how ESI organized its auto-ship program to over-charge DoD on a massive scale. Specifically, ESI: 1) enrolled as many Tricare members as possible in the auto-ship program; and 2) calibrated the logic of the auto-ship software so that a prescription would be refilled at the 67% usage date, then reset the refill "clock" immediately, continuing this cycle indefinitely without regard to the compounding effect of the surplus. *Id.* ¶ 3. The PIC observed that the ESI team responsible for designing the dispensing software, including senior directors and managers, "deliberately calibrated" it in this manner in software iterations both before and after ESI's merger with Medco in 2012. *Id.* ¶¶ 54-56.

Through this scheme, ESI essentially operated a refill "pill mill." *Id.* ¶ 4. By the end of a year, each Tricare beneficiary received 73% more pills of each maintenance drug on auto-refill than was originally prescribed, repeating that pattern year after year, placing patients' health at risk as they accumulated unneeded refills of expired medications. *Id.* ¶¶ 4, 43. Together with Relator's other principals, senior executives of a technology company who also have first-hand knowledge of ESI's member experiences and dispensing practices, the PIC formed the Relator entity and filed this case to hold ESI accountable. *Id.* ¶ 7.

ESI's fraud was a top-down scheme, with executives involved at the highest level. *Id.* ¶¶ 55, 113. The PIC Relator "repeatedly raised concerns" with ESI management and employees about the manner in which ESI calibrated its software to dispense excessive medication, but no one at ESI corrected the practice for years, even though ESI's own Vice President of Pharmacy Compliance and other managers shared the PIC's concerns that ESI's "dispensing practices were causing a great deal of medication waste." *Id.* ¶¶ 54, 56, 88-89.

Instead, ESI continued to enroll as many Tricare members as it could in

the auto-ship program, and refused to recalibrate the logic in its refill algorithm. *Id*. ¶¶ 3, 90. For instance, ESI would deliberately confuse patients through ESI's online portal, mislead patients with unclear robocalls, and use every tool at its disposal to place and keep patients on the wasteful auto-ship program. *Id.* ¶¶ 63, 64, 65, 67. ESI aligned employee compensation with the rate at which employees enrolled beneficiaries in the auto-ship program, *id*. ¶¶ 66, 81, 82, and contacted prescribers, unbeknownst to and without authorization from patients, to generate new prescriptions and more dispensing fees. *Id*. ¶¶ 41,42. All along, ESI knew that it was unlikely that beneficiaries would "make noise" with ESI or DoD about the over-supply given that DoD, not the patient, was on the hook for most or all it. *Id.* ¶ 85 (no co-payments were required from members for many Tricare formulary drugs during the relevant period). When conscientious Tricare members *did* complain to ESI, the complaints were ignored. *Id.* ¶¶ 49-52, 93.

ESI knew exactly what it was doing, and knew it to be wasteful and wrong, yet continued to specifically target the United States and its military and veteran beneficiaries. Indeed, when ESI acted as the PBM for private insurers, ESI protected its clients' dollars by not permitting refills until later in the usage cycle, and imposed on pharmacies rules against diverging from physicians' prescriptions on days' supply, routinely penalizing or terminating pharmacies for the very sort of fraud, waste, and abuse that it intentionally foisted on Tricare on a massive scale. *Id.* ¶¶ 59, 72, 116-121.

Moreover, ESI actively concealed its fraudulent dispensing practices from the government. *Id.* ¶¶ 94, 103. ESI knew that intermittent government audits focused more on extreme anomalies as opposed to everyday dispensing patterns, and ensured that its audit responses would not disclose that ESI's dispensing software was calibrated to over-dispense medication. *Id*. ¶¶ 84, 100. For example, during a DoD Inspector General ("DOD IG") audit in 2013/2014, the PIC Relator, who participated in ESI's audit response, observed that ESI made no

mention of the calibration of its dispensing software to the government auditors, or of the excessive supply of medication to Tricare beneficiaries. *Id.* ¶¶ 94-100. Not surprisingly, the audit report issued by DoD IG stated that while the IG auditors had "attempted to obtain information" on waste resulting from "delivered, unneeded prescription medication," ESI had claimed that it "could not provide [such] data," and thus the auditors were not able to review "patient utilization of their medications." *Id.* ¶¶ 101-105. Later, ESI again successfully deflected DoD investigators during a separate 2015 review. *Id.* ¶¶ 106-109.

ESI had ample opportunity to correct its auto-ship calibration, but consciously chose to continue and extend its fraud, for years. *Id*. ¶¶ 55, 57. Finally, in late 2017 or early 2018, ESI changed the calibration of its dispensing software to refill only the first refill at day 60 of a 90-day supply (or day 20 of a 30-day supply), with the second and all subsequent refills shipped on day 90, a simple fix that ESI could have and should have made many years earlier. *Id.*

## II. THE "PUBLIC DISCLOSURES" ALLEGED BY DEFENDANTS

In 2013, a publication known as the *Army Times* printed a one-page article titled "*DoD: Mail-order meds program may waste money*." ECF No. 55-6. The article reported on the just-concluded DoD IG investigation, which, as the article reflects, had focused on the *savings* created by the mail order program, and confirmed "[that DoD IG] had no data on how much medicine is wasted by the program, managed by Express Scripts." *Id*. The article reported several complaints about the quality of ESI's mail-order customer service, including a single instance of ESI over-dispensing prescription medications to a retired Air Force officer who was interviewed for the article. *Id*. Then, in 2014, public comments in the Federal Register about proposed improvements being made by DoD to Tricare pharmacy services included those submitted by a "professional association" that remarked vaguely on "unnecessary waste resulting from auto-ship policies" and suggested but did not specify the implementation of "policies

to ensure mail order refills are approved and needed." CHAMPUS/TRICARE: Refills of Maintenance Medication Through Military Treatment Facility Pharmacies or National Mail Order Pharmacy Program, 81 Fed. Reg. 76307-01, 76,309 (Nov. 2, 2016) (to be codified at 32 C.F.R. pt. 199).

Neither the *Army Times* article nor the Federal Register comments disclosed ESI's intentional, fraudulent scheme to over-fill prescriptions; the auto-refill program carefully calibrated to carry it out; the massive scale of the scheme; ESI's knowledge that its auto-refill practices were unlawful; that ESI implemented different standards when it acted as PBM; or ESI's active concealment of its practices from the United States, all of which was first alleged in the Complaint. *See* Compl. *passim*.

## **LEGAL STANDARDS**

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). A claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678. *See also United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984, 991 (9th Cir. 2011). An FCA complaint must satisfy the heightened pleading standard of Fed. R. Civ. P. 9(b), but to do so, it need not list every detail of the alleged fraud, nor provide representative examples. *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998-99 (9th Cir. 2010).[2]

## **ARGUMENT**

Defendants' "public disclosure" defense under the FCA fails as a matter of law. *Qui tam* actions under the FCA are subject to a public disclosure bar, which

[2] As demonstrated below, the Motion should be denied. In the event the Court disagrees, any dismissal should be without prejudice. *See Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (dismissal without leave to amend is improper unless the complaint could not be saved by any amendment).

provides that a court "shall dismiss an action or claim … if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed," unless the relator is an "original source of the information." 31 U.S.C.A. § 3730(e)(4)(A). Here, the sources relied upon by Defendants did not publicly disclose fraud or intentional misconduct by ESI at all, let alone the same allegations and transactions alleged by Relator in the Complaint. Even if the defense were applicable, *in arguendo*, Relator clearly qualifies as an original source, thereby precluding dismissal on public disclosure grounds.

Relator also has pleaded ESI's fraud with sufficient particularity, including the FCA elements of falsity, materiality, and scienter. Defendants' Motion should be denied in full as to Relator's claims against ESI.

# I. THE PUBLIC DISCLOSURE BAR DOES NOT APPLY.

## A. The Relator's allegations were never publicly disclosed.

In *United States ex rel. Mateski v. Raytheon Co.*, 816 F.3d 565, 570-71 (9th Cir. 2016), the Ninth Circuit stated that while "[t]he False Claims Act's public disclosure bar uses the terms 'allegations' and 'transactions' without defining either term[,] . . . [c]ourts have interpreted 'allegation' to refer to a direct claim of fraud, and 'transaction' to refer to facts from which fraud can be inferred." (citation omitted). "An allegation of fraud is an explicit accusation of wrongdoing. A transaction warranting an inference of fraud is one that is composed of a misrepresented state of facts plus the actual state of facts." *Id.* (citing 31 U.S.C. § 3730(e)(4)(A)). Further expanding, the court explained:

> [I]f X + Y = Z, Z represents the allegation of fraud and X and Y represent its essential elements. In order to disclose the fraudulent transaction publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, i.e., the conclusion that fraud has been committed.
>
> We have further explained that, "in a fraud case, X and Y inevitably stand for but two elements: 'a misrepresented state of facts and a true state of facts.'" "[I]n order to invoke the jurisdictional bar, a defendant must show 'that the transaction ... [is] one in which a set of misrepresented facts has been submitted to the government.'"

*Id.* (citing *United States ex rel. Found. Aiding the Elderly v. Horizon W., Inc.*, 265 F.3d 1011, 1015-16 *amended by* 275 F.3d 1189 (9th Cir. 2001), and *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1994)).

Courts in this Circuit have further held that "[t]he [public disclosure] bar does not apply where a relator's complaint 'alleges fraud that is *different in kind and in degree* from the previously disclosed information.'" *United States ex rel. Jahr v. Tetra Tech EC, Inc.*, No. 13-cv-03835-JD, 2022 WL 2317268, at *9 (N.D. Cal. June 28, 2022) (citing *Mateski*, 816 F.3d at 578) (emphasis added).

Neither purported source relied on by Defendants made a "direct claim of fraud," or showed a "combination of . . . a misrepresented state of facts and a true state of facts" from which to infer fraud remotely similar to that alleged in the Complaint. Thus, neither source disclosed the same "allegations" or "transactions" that Relator pleaded in its Complaint, which are "different in kind and degree" from both publications. Therefore, they do not constitute a public disclosure that bars the Complaint as a matter of law.

**1. The *Army Times* article did not disclose the nature or degree of ESI's fraud, or infer fraud at all.**

In their prominent side-by-side comparison of the *Army Times* article and the Complaint, Defendants cite just three sentences within the article that have any similarity to Relator's 135-paragraph complaint. ECF No. 55-1 at 6-7 (citing the article wherein it quotes a retired Air Force Master Sgt. as complaining that he received "90-day supplies after 60 days" and had a "nine-month supply of drugs" after a year that he apparently kept "piled in medicine cabinets and linen closets"). These passages, however, merely reflect the *Army Times'* interview of a single retired service member about his individual, anecdotal experience with the quality of ESI's auto-refill program. The remainder of the article turns to

other examples of poor customer experiences, and notably disclaims any findings on overall waste in the program by DoD. *See* ECF No. 55-6.

In contrast, as the Complaint makes clear, "[t]his case concerns the *flagrant* and *persistent* over-dispensing of prescription drugs to millions of patients by Express Scripts" through ESI's intentional, improper calibration of its auto-refill program. *See* Compl. ¶¶ 1-5 (emphasis added). Nothing of the sort appears in the article. In fact, the *Army Times* article does not disclose any "allegation" at all that can be matched against those in the Complaint. The mere possibility that ESI "may be wasting money," as the article's headline suggests, is far from a "direct claim of fraud." *Mateski*, 816 F.3d at 571. As the Complaint alleges, ESI did not just carelessly or negligently ship excess medications to a single veteran officer—it intentionally perpetrated a scheme on the entire United States military, active and inactive; built an entire infrastructure, including computer coding, to carry it out; and wrongfully collected "billions of dollars in excessive dispensing fees and drug replacement costs." Compl. ¶¶ 3, 5. That type of intentional, systematic, and far-reaching fraud is different—both in kind and in degree—than a single anecdotal report of waste that did not even hint of fraud.

Moreover, the Complaint contains an expansive description of the specific "transactions" by which ESI committed its fraud, none of which are found in the *Army Times* article. Without these details, the *Army Times* cannot serve as a public disclosure barring the Complaint because it did not show the "set of misrepresented facts [that] has been submitted to the government" (the "X") in combination with the "true state of facts" (the "Y") such that fraud could be inferred (the "Z"). *Mateski*, 816 F.3d at 571.

These specific transactions, found only in the Complaint, include the existence, extent, and methods of ESI's fraudulent scheme. There is no disclosure in the *Army Times* article, for example, that ESI calibrated the logic of its pharmacy dispensing software to systematically over-supply prescription refills,

let alone that the single retired officer's alleged experience was anything beyond a one-off blip in a system that was prone to errors (according to the article). On the contrary, the *Army Times* article includes contradictory allegations—that in some instances, ESI did not ship a surplus of medication, but instead notified patients that it was "out of stock" of medications, forcing a particular Retired Navy Chief Petty Officer "to purchase drugs locally at a much higher price." *See* ECF No. 55-6. The article did not disclose ESI's cover-up of its scheme during DoD audits, including during the very DoD IG audit that the article reported about. Compl. ¶¶ 94-105. In the words of the *Mateski* court, "[a]llowing a public document describing 'problems'—or even some generalized fraud ... to bar all FCA suits identifying specific instances of fraud ... would deprive the Government of information that could lead to recovery of misspent Government funds and prevention of further fraud." *Mateski*, 816 F.3d at 577.

Any careful side-by-side reading of the Complaint and the *Army Times* article demonstrates that the Complaint is different in kind and in degree from the previously disclosed information.'" *Jahr*, 2022 WL 2317268, at *9.

**2. The Federal Register did not make any disclosures that would lead to the inference of the same or similar fraud.**

The comments in the Federal Register referenced by Defendants disclosed even less than the *Army Times* article, and thus are even further from the sort of "public disclosure" that can bar the Complaint. As summarized by Defendants, "a 'professional association' commented [in the Federal Register] about alleged 'unnecessary waste resulting from auto-ship policies' and suggested implementing 'policies to ensure mail order refills are approved and needed.'" ECF No. 55-1 at 8-9 (citing 81 Fed. Reg. at 76,309).

But the professional association's comments and suggestions were simply about unspecified auto-ship policies, not fraud of any kind, and certainly not to the degree or in the nature alleged in the Complaint. Like the *Army Times*, the

comments did not assert that ESI was intentionally wasteful, or in what way. Again, without a "direct claim of fraud" the Federal Register did not publicly disclose the same "allegations" alleged in the Complaint. *Mateski*, 816 F.3d at 571. Nor did the Federal Register disclose the same "transactions" referred to in the Complaint. In fact, there is no "X" at all in the Register comments, *i.e.*, the misrepresented state of facts, and no allegation that ESI conspired to fraudulently increase federal reimbursements by calibrating its pharmacy dispensing software unlawfully, or that it applied this calibration universally to all Tricare members.

The Ninth Circuit has repeatedly warned of the dangers of allowing generalizations like those found in the Federal Register to preclude actions under the FCA via the public disclosure bar. In *Mark ex rel. United States v. Shamir USA, Inc.*, for example, the defendants attempted to raise the public disclosure defense against anti-kickback fraud based on just "one announcement" in which the defendants had vaguely alluded to their rewards-back program and other benefits offered for using their products. No. 20-56280, 2022 WL 327475, at *2 (9th Cir. Feb. 3, 2022). The court found that "the information disseminated was so innocuous that there was no public disclosure of a transaction or allegation of fraud in the first instance, as required under the FCA." *Id.*

The same result is required here, to avoid "the dangers of allowing a generalized description of a program that could give rise to fraud in public documents to prevent the pursuit of legitimate fraud[.]" *Id.*

### B. Even if the public disclosure bar were applicable—which it is not—Relator qualifies as an original source.

Given the glaring differences between the Complaint and the prior publications relied on by Defendants, the public disclosure bar is inapplicable. But even if this Court were to find that the *Army Times* and/or the Federal Register contained substantially the same transactions and allegations as the Complaint, Relator's Complaint would still survive the Motion because Relator is

an original source against whom the public disclosure defense does not apply.

**1. LLCs like Relator can be original sources.**

No court in the Ninth Circuit or elsewhere has *ever* held that LLCs are categorically unqualified to be original sources under the modern FCA, as Defendants assert. *See* ECF No. 55-1 at 10-12. In an attempt to persuade this Court to be the first to so hold, Defendants proclaim that Relator, as an LLC, "does not allege, nor could it, that it has knowledge of any relevant facts" based on the "bedrock principle that 'LLCs are distinct legal entities[.]" *Id*. at 11-12 (citing *Abrahim & Sons Enters. v. Equilon Enters., LLC*, 292 F.3d 958, 962 (9th Cir. 2002)). But Defendants' proclamation is meritless.

Courts have consistently recognized that business entities, including LLCs, *can* constitute original sources under the FCA, both under the modern version of the rule enacted in 2010 that governs here, and even the more restrictive, pre-2010 version. For example, a Louisiana court found explicitly that an LLC relator "qualifies as an original source for the purposes of the FCA." *United States ex rel. Branch Consultants, L.L.C. v. Allstate Ins. Co.*, 668 F. Supp. 2d 780, 803 (E.D. La. 2009). In doing so, the court rejected the idea that the relator's status as a corporate entity means the relator cannot have direct knowledge, where direct knowledge was a requirement under the pre-2010 version of the FCA's original source rule. *Id*. at 801 ("[n]o courts have held that corporations responsible for the discovery of information cannot have 'direct knowledge' because they have to act through agents.").

Similarly, the Third Circuit found in 2016, applying the post-2010 original source rule, that a relator qualified as an original source even though it was a law firm organized as a professional association. *See United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294 (3d Cir. 2016). The District of Columbia found "beyond question" that a corporate relator had sufficiently direct knowledge to be an original source. *Quinn*, 14 F.3d at 657.

The Eighth Circuit has held that "[t]hough organizations must, of course, act through agents, this does not render their knowledge parasitical or their agency 'intervening' in the sense of interrupting the causal connection between the corporation's efforts and the knowledge." *Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1049 (8th Cir. 2002) ("corporate plaintiffs have been held to have direct knowledge making them an original source."). Thus, many courts have rejected the notion proposed by Defendants here that business entities like LLCs, as distinct from their principals, are ineligible to be original sources.

Indeed, limited liability companies like Relator are legally capable under the law of "knowing" relevant facts, and their status as separate entities from their member-managers does not change that, as courts in this Circuit have held. *See e.g. United States ex rel. STF, LLC v. Vibrant Am., LLC*, No. 16-cv-02487-JCS, 2020 WL 4818706, at *19 (N.D. Cal. Aug. 19, 2020) (LLC relator adequately pleaded scienter by alleging that the defendant LLC "knows this strategy is illegal[.]"). The scienter element of the FCA itself provides that any "person" who "knowingly" commits a violation is liable, 31 U.S.C.A. § 3729(a), where "person" is defined by the U.S. Code to "include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C.A. § 1.

Ignoring this authority, Defendants rely on a line of cases decided under the *pre*-2010 version of the original source rule that should have little application here, as it is the *post*-2010 version of the rule that primarily governs in this case (filed in 2019 with a maximum 10-year look-back period under the FCA). In 2010, Congress deleted the word "direct" from the original source rule and thus removed any requirement that an original source have "direct," as opposed to "indirect," knowledge of the fraud; instead under the modern rule, "knowledge that is independent of and materially adds to the publicly disclosed allegations or

transactions" is sufficient. *See* 31 U.S.C.A. § 3730(e)(4)(A)-(B) (history). Defendants' cases, which were all decided, in relevant part, under the pre-2010 rule, suggested that LLC relators possess only indirect knowledge through their principals or other persons, and thus may be foreclosed from being original sources. *See United States ex rel. Precision Co. v. Koch Indus., Inc.*, 971 F.2d 548, 554 (10th Cir. 1992) (under the pre-2010 FCA, corporate relator's knowledge was not "direct" where it came from its members); *Fed. Recovery Servs., Inc. v. United States*, 72 F.3d 447, 451-52 (5th Cir. 1995) (same); *United States ex rel. CKD Project, LLC v. Fresenius Med. Care Holdings, Inc.*, 551 F. Supp. 3d 27, 45 (E.D.N.Y. 2021), *aff'd* 2022 WL 17818587 (2d Cir. Dec. 20, 2022) (knowledge of LLC relator insufficient under the pre-2010 FCA because it "was indirect from a third party"). But these decisions stand opposed to the view of many other courts that recognized, even *pre*-2010, that LLC relators can be original sources based on the direct knowledge of their members. *See supra Branch Consultants, Quinn, Allina Health Sys.*

Given that this case involves almost exclusively conduct governed by the post-2010 FCA, even if Relator's knowledge here was "indirect"—it was not, but instead flowed from Relator's own principals, which most courts recognize to be "direct" knowledge anyway—this is clearly sufficient under the modern original source rule. *See* Compl. ¶¶ 7, 54, 56, 66, 88, 89, 92, 93, 96, 97, 100, 103, 107, 108, 113 (specifying the independent knowledge of ESI's fraud that Relator possesses through its principals, including the PIC Relator).

**2. Relator's Complaint provides material additions to the previous disclosures.**

There can be no serious debate that the Complaint includes allegations far beyond the "disclosures" in Defendants' two sources. With Relator's insights, the Complaint did not merely "provide only background information and details relating to the alleged fraud" (fraud which the *Army Times* and Federal Register

never disclosed or implied anyway); rather, Relator's allegations clearly "add[ed] value to what the government already knew." *United States ex rel. Hastings v. Wells Fargo Bank, NA, Inc.*, 656 F. App'x. 328, 331-32 (9th Cir. 2016). The Complaint adds specific, detailed information about how ESI coded its software with the intent to over-fill prescriptions and that ESI actively concealed its conduct from the government, among many other allegations found nowhere in Defendants' sources. As such, Relator has adequately pleaded that it materially added to the government's knowledge to qualify as an original source. *See supra.*

Defendants urge otherwise by analogizing this case, once again, to *CKD Project*, which is inapposite. *See CKD Project*, 551 F. Supp. 3d at 46 (as to post-2010 allegations governed by modern original source rule, relator provided "no detail" about the source of its information and offered "nothing" to demonstrate its "contributions to the public record"). Defendants also cite *United States v. N. Am. Health Care, Inc.*, 173 F. Supp. 3d 943 (N.D. Cal. 2016), wherein the court rejected relator's argument that it "met the materiality requirement . . . by showing the government that fraud that was previously disclosed continued after the disclosure[.]" 173 F. Supp. 3d at 951 ("[w]here the allegations are simply that the same fraud previously disclosed is ongoing, those allegations will be barred"). The Complaint here did not reveal the mere continuation of a fraud already disclosed, but was the first and only source that described the fraud at all.

**3. Government Disclosure**

Finally, Defendants ask this Court to find that Relator cannot be an original source because the Complaint lacks an express allegation that Relator "voluntarily provided the information to the Government before filing an action." *See* ECF No. 55-1 at 14 (citing 31 U.S.C.A. § 3730(e)(4)(B)). But the structure of the public disclosure rule shows that a relator is *not* required to specifically allege its pre-filing disclosure to the government in a FCA complaint.

The "original source" rule is an exception to the public disclosure bar,

which is itself a defense to a FCA claim. *See* 31 U.S.C.A. § 3730(e)(4)(A)-(B); *Silbersher v. Valeant Pharms. Int'l, Inc.*, 445 F. Supp. 3d 393, 402 (N.D. Cal. 2020) ("With the 2010 amendments, Congress changed public disclosure from a jurisdictional issue to a defense."). Plaintiffs generally are not required to plead exceptions to defenses before defendants even raise them. *See Nayab v. Cap. One Bank (USA), N.A.*, 942 F.3d 480, 497-98 (9th Cir. 2019) ("When this Court has evaluated similarly drafted provisions of other statutes, it has decided that the provision is an affirmative defense, which a plaintiff need not negative in his complaint.") (citations omitted).

While Relator was not required to include the allegation in the Complaint, Relator hereby proffers, and will add such proffer to an amended pleading if deemed necessary, that Relator *did* make the required disclosures to the government before filing the instant action. *See* Decl. of Wayne Lamprey, filed contemporaneously herewith. At the motion to dismiss stage, however, the issue is premature, not "fatal," and easily addressed by the proffer. Even Defendants' authority agrees as much. *See Silbersher* 445 F. Supp. 3d at 408 (where there was no allegation in the complaint "*or elsewhere*" that relator communicated with the government before filing, leave to amend granted) (emphasis added).

## II. THE COMPLAINT ADEQUATELY PLEADS THE REQUIRED ELEMENTS OF AN FCA CLAIM.

Beyond their ill-founded attempt to raise a public disclosure defense, Defendants also argue, futilely, that Relator has not pleaded the elements of an FCA claim with particularity under Rule 9(b). *See* ECF No. 55-1 at 15. Each of Defendants' arguments fails as a matter of law.

### A. Relators have adequately pleaded falsity under the FCA.

Defendants contend that the regulations and contractual provisions that ESI violated do not provide a "clear benchmark or objective threshold" by which to conclude that ESI is liable for submitting "false" claims. *See* ECF No 55-1

(citing *United States ex rel. DeFatta v. United Parcel Serv., Inc.*, 771 F. App'x 735, 738 (9th Cir. 2019)). Defendants are wrong, both as to the nature of the violations and their import under the FCA.

The Ninth Circuit recently held that "a plaintiff need not allege falsity beyond the requirements adopted by Congress in the FCA …. Congress imposed no requirement of proving 'objective falsity,' and we have no authority to rewrite the statute to add such a requirement." *Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1113 (9th Cir. 2020) *cert. denied*, 141 S. Ct. 1380 (2021) (reversing dismissal).

The regulations and contractual provisions referred to in the Complaint explicitly prohibit wasteful, inefficient, and fraudulent practices exactly like those ESI employed. These include:

- The Tricare requirement that ESI prevent, detect, and correct fraud, waste, and abuse in the pharmacy program, where "fraud" includes "*flagrant and persistent overutilization of services without proper regard for results, the patient's ailments, condition, medical needs, or the physician's orders*," and billing for services that would be covered except for "*the frequency*" of the services. 32 C.F.R. § 199.9(c)(2), (5) (2020); 32 C.F.R. § 199.21 (2018) (emphasis added); Compl. ¶¶ 25-27.

- Arizona pharmacy regulations, to which ESI is subject due to its operation of its mail-order pharmacy in Tempe, requiring pharmacies to ensure that dispensed medications are "*consisten[t] with [the] prescription order*," to "*[v]erify the legality and pharmaceutical feasibility of dispensing a drug,*" including "[*t*]*he frequency of refills*," and to ensure that drugs are dispensed in quantities consistent with the prescriber's orders. Ariz. Admin. Code § R4-23-402(A)(5), (10), (11) (emphasis added); Compl.¶¶ 30-32.

The various Tricare Pharmacy Program Services Contracts between ESI and DHA (the "TPharm's"), including but not limited to the sections excerpted by Defendants in the Motion, impose similar requirements on ESI to:

- "Uniformly, consistently, and *equitably* provide a prescription drug benefit to meet patients' clinical needs *in an effective, efficient, and fiscally responsible manner*." ECF No. 55-3 at Section C §C.2.1 (emphasis added). *See also* Compl. ¶ 35.

- "Use a *cost-effective management approach* to provide the necessary services, incorporating commercial practices consistent with the requirements of the contract." *Id.* § C.2.5 (emphasis added).

- Report to DHS when "*the patient may not correctly receive the correction duration of therapy*" or the "*incorrect quantity [of medication is] dispensed*." Exh. A hereto, TPharm4, § C.7.6 (emphasis added).
- Implement "an effective method for fraud, waste and abuse prevention and detection[,]" including "*inappropriate billing practices*" when a pharmacy bills for "*incorrect quantity or days supply*[.]" Exh. A hereto, TPharm4, § C.11.5.2.1; Exh. B hereto, TPharm2, § C.5.14.2 (emphasis added).

Defendants' Motion would have this Court read all these regulations and contractual provisions as if they carried no meaning. Moreover, the mere fact that a mandate is broad does not mean it fails to provide concrete standards. Indeed, courts across the country have determined that even broader language—granting a significant degree of discretion to a defendant—can form an adequate basis to assess falsity under the FCA, and the Ninth Circuit has recently expressly rejected Defendants' contention that "objective falsity" is required under the FCA. *Winter*, *supra*, 953 F.3d at 1113.

For instance, in *Kellogg Brown & Root Services, Inc. v. United States* ("*KBRSI*"), the Federal Circuit found that a contractor with the Department of Defense could be held liable under the FCA where various regulations and contract provisions broadly required the contractor's "best efforts" and "reasonableness." 728 F.3d 1348, 1359 (Fed. Cir. 2013). That kind of regulatory and contractual interpretation coincides neatly with the FCA. As the Ninth Circuit has explained, "[w]e construe the Act broadly, as it is 'intended to reach all types of fraud, without qualification, that might result in financial loss to the Government,'" and "[s]uch broad construction has thus given rise to a number of doctrines 'that attach potential False Claims Act liability to claims for payment that are not explicitly and/or independently false.'" *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 899 (9th Cir. 2017) (quoting *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1170-71 (9th Cir. 2006)).

Just as courts have found falsity in examining terms like "best efforts" and

"reasonableness," so too should this Court find viable claims from more specific mandates, like those against "flagrant and persistent overutilization of services without proper regard for results, the patient's ailments, condition, medical needs, or the physician's orders." 32 C.F.R. § 199.9(c)(5) (2020).

Moreover, although Defendants contend there were no "specific dispensing guidelines[,]" (ECF No. 55-1), the Complaint unambiguously alleges that there were. The prescribing physicians provided the necessary information "for a pharmacist to calculate the total number of pills to be dispensed on an initial fill or subsequent refill of a maintenance drug based on the information provided by the authorized prescriber on the prescription, including quantity and doses per day." Compl. ¶ 71. But ESI did not dispense medications as prescribed, violating these binding pharmacy industry standards. *Id.* ¶ 72.

The cases that ESI cites in support of its proposition that "clear benchmarks" and "objective thresholds" are required in the regulatory or contractual standards to establish FCA falsity are inapposite. One dealt with a complaint where no specific statutory, regulatory, or contractual requirements were cited at all, which is not the case here. *See United States ex. rel. Whatley v. Eastwick Coll.*, 657 F. App'x. 89, 94 (3d Cir. 2016) (relator did "not identify any statutes, regulations, or contractual provisions that the [defendants] violated through their alleged behavior"). Others involved claims where the relator's allegations did not allege a violation of the cited mandate, which is again not at issue here. *See DeFatta*, 771 F. App'x at 738 (government contract permitted the alleged conduct); *United States ex rel. Bly-Magee v. Premo*, 333 F. App'x 169, 170-71 (9th Cir. 2009) (alleged conduct did not constitute a kickback); *United States ex rel. O'Neill v. Somnia, Inc.*, 339 F. Supp. 3d 947, 955-57 (E.D. Cal. 2018) (Medicare manual permitted coding that relator alleged to be wrongful).

Finally, one Northern District of California case relied on by Defendants, decided *before* the 9th Circuit's *Winter* decision rejecting the requirement of

"objective falsity" in FCA cases, found an absence of falsity where the defendants were vested with "discretion" as to how and whether to comply with "imprecise" mandates. *See United States v. McKesson Corp.*, No. 19-cv-02233-DMR, 2020 WL 4805034, at *5 (N.D. Cal. Aug. 18, 2020) (dismissing complaint where the relator alleged, for example, that the defendant did not staff enough security personnel). Here, there is nothing discretionary about waste, fraud, and abuse requirements in the Tricare mandates, which expressly forbid overutilization and dispensing in a manner inconsistent with the prescription order, just as ESI is accused of doing.

No rule is so clear that it leaves zero room for subjective judgments at the margins. ESI's decision to renew every 60 days *ad infinitum* shocks the conscience. It is plainly unreasonable under *any* definition of efficiency, fraud, waste or abuse. To say such prohibitions on government contractors are, by definition, automatically outside the ambit of the FCA—without even considering the actual conduct at issue—is to neuter the government's most important enforcement tool.

ESI is liable because it manipulated an otherwise-lawful refill program to fraudulently extract billions in excessive fees through the algorithm that it deliberately programmed to over-dispense refills. While Defendants rely on the 2013 DoD IG Report to highlight commendations for the mail-order program (*see* ECF No. 55-1 at 18), they entirely ignore the allegation that ESI concealed its fraud during the DoD IG's audit leading up to that very report. *See* Compl. ¶¶ 94-105. If anything, that report, along with a later 2017 DoD IG Report (ECF No. 55-9), establishes that ESI's wasteful practices *are* a sufficiently specific basis upon which to audit Defendants. *See id*; ECF No. 55-9 ("The DHA defines 'abuse' as any practice that is inconsistent with accepted practice which results in a claim, unnecessary costs, or payment for services or supplies not medically necessary and appropriate, or that fail to meet professionally recognized

standards."). The waste in this case was so excessive that it crossed any line of reasonableness created by the controlling regulations and contracts.

Indeed, Defendants' arguments on falsity fail because they are simply premature. ESI will have every opportunity at trial to attempt to persuade the trier-of-fact that ESI's services were "effective, efficient, and fiscally responsible." ECF No. 55-3 at Section C §C.2.1. But that inquiry is ultimately one of fact, not of law. *See KBRSI*, 728 F.3d at 1360 (". . . reasonableness 'is a question of fact.'") (citation omitted). Relator has alleged more than enough to show falsity under the FCA.

**B. Relators have adequately pleaded materiality under the FCA.**

FCA materiality requires allegations that the defendant's conduct had "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 193 (2016). Given Relator's allegations that ESI's gross over-dispensing practices led to billions-of-dollars of unwarranted claims, the Complaint easily satisfies this test.

Defendants' argument to the contrary comes down to their claim—unsupported and highly contested—that "the government continued to pay the claims even though it knew of ESI's dispensing practices via the public disclosures." ECF No. 55-1 at 20. But the fact that the government "continued to pay" after the *Army Times* article and Federal Register comments is not surprising, given that the sources did not disclose the fraud; in fact, ESI took affirmative steps before and after the "disclosures" to conceal its actual scheme from the government. *See supra* § I(A); Compl. ¶¶ 5, 34, 86, 94, 103, 109.

It is thus of no import that "DHA actually communicated with ESI regarding the [*Army Times*] article at the time it was published." ECF No. 55-1 at 20 (citing Ex. F) (emphasis in original removed). If government employees saw the article in 2013, this only means that they received the limited information

within it, which did not disclose or infer ESI's scheme. In the brief email exchange on the subject offered by ESI, nothing is mentioned about over-supply issues at all, evidencing the *absence* of any meaningful disclosure. *Id*.

Defendants' citation to the 2017 DoD IG report—Exhibit G to their Motion—is also misplaced. That report simply states that "TRICARE *permits* prescription refills *when the beneficiary has used 75 percent of the prescribed medication*." ECF No. 55-9 at 54 n. 12 (emphasis added). As the Complaint alleges, this is *not* how ESI's actual auto-fill program worked at all. Instead, ESI refilled medications every 60 days on a 90-day supply—*e.g.*, at 67%, not 75%—and that it did so over and over, irrespective of when the beneficiary had *actually* used 75% of the prescription and irrespective of need. *See, e.g.,* Compl. ¶ 3.

Indeed, ESI's most recent TPharm contract, entered into with DHA in 2021 after this lawsuit was filed, leaves little doubt that Relator's allegations of ESI's fraud are in fact "material to the government's decision to pay a claim." *Escobar*, 579 U.S. at 181. TPharm5 provides that the government is only willing to accept, at most, a refill buffer of up to 85 days of extra medication in any given year. *See* ECF No. 55-5 at 20 § C.6.1.23.4 ("*The Contractor shall not dispense prescriptions exceeding 450 days' supply over the course any 365 day period*[.]"). Relator has alleged that ESI dispensed more than *three times* that amount—a 265 day buffer—as a matter of course. *See e.g.* Compl. ¶ 3. ESI thus more than *tripled* the *maximum* permitted excess supply, for every prescription delivered to every Tricare member, for years.

ESI's scheme, carefully hidden from the government, clearly had a "natural tendency to influence, or be capable of influencing" the government's payment decision, easily satisfying FCA materiality. *Escobar*, 579 U.S. at 182.

### C. Relators have adequately pleaded that ESI acted with scienter under the FCA.

As alleged in the Complaint, ESI deliberately programmed its auto-refill

dispensing software to over-dispense medication and to cause excessive claims for reimbursement to the Tricare program. This is more than enough to satisfy the FCA's scienter requirement. *See United States ex rel. Hartpence v. Kinetic Concepts, Inc.*, 44 F.4th 838, 851 (9th Cir. 2022) ("a false statement or false claim is knowingly made by a person if that person has actual knowledge of the falsity or if that person acts in deliberate ignorance or reckless disregard of its truth or falsity. *See* 31 U.S.C. § 3729(b)(1)(A).").

Defendants argue that ESI's "interpretation" of its regulatory and contractual obligations must be considered reasonable, negating scienter, because the TPharm contracts "contained no specific requirements regarding refill scheduling and frequency." *See* ECF No 55-1 at 22. But even if those contracts are properly before the Court on a motion to dismiss, they show that, during the relevant period, the government *did* specify that refills must be handled consistent with express prohibitions against waste and over-utilization, requirements that ESI breached on a massive scale by dispensing too early and compounding the error over and over with refills. *See supra* § II(A); Compl. ¶¶ 3, 35. ESI over-dispensed medication in an amount far in excess of that permitted, expressly or impliedly, by *any* law, rule or contract.

Defendants apparently contend that, as a matter of law, it would be reasonable to conclude that there was *no* "maximum supply of medication ESI was able to dispense." ECF No. 55-1 at 22. That rationale would allow ESI infinite leeway to send unlimited refills at the government's expense. The scienter issue again comes down to a fact-based question of line-drawing: how much of a medication buffer was reasonable to dispense. *See KBRSI*, 728 F.3d at 1360 ("reasonableness 'is a question of fact.'") (citing *Gen. Dynamics Corp. v. United States*, 410 F.2d 404, 409 (Ct. Cl. 1969)). Relator has pleaded that ESI egregiously and knowingly crossed the line.

Finally, Defendants contend that because the government was aware of

ESI's dispensing practices "via public disclosures," there can be no scienter. ECF No 55-1 at 23. But once again, they rely on the same two sources that did not disclose the same scheme at all, *see supra* § I(a)(i)-(ii), and ignore Relator's allegations that ESI actively concealed the scheme from the government (*see* Compl. ¶¶ 83-86). The fact that DoD renewed its contracts with ESI and paid ESI's claims says nothing about government acquiescence to ESI's refill excesses, which Relator alleges DoD was not aware of.

In any event, the question of "the knowledge possessed by officials of the United States … cannot be reached by mere inspection of [the relator's] complaint," but "[o]nly at the stage of trial or summary judgment." *United States v. Bollinger Shipyards, Inc.*, 775 F.3d 255, 264 n.27 (5th Cir. 2014) (quoting *United States ex rel. Hagood v. Sonoma Cnty. Water Agency*, 929 F.2d 1416 (9th Cir.1991) ("The government knowledge defense is not appropriate at the motion to dismiss stage.") *See also Hooper v. Lockheed Martin Corp.*, 688 F.3d 1037, 1051 (9th Cir. 2012) ("[a]fter the 1986 amendments to the FCA, government knowledge is no longer an automatic bar to suit, [and] courts have had to decide case by case whether a FCA claim based on information in the government's possession can succeed.") (citation omitted).

The Complaint easily satisfies the FCA's scienter requirement.

## CONCLUSION

For all the reasons stated above, Defendants' Motion should be denied in full as to Defendant Express Scripts, Inc., which orchestrated a massive, deliberate scheme to defraud the United States of billions-of-dollars in extra dispensing fees and wasted, unnecessary medication refills. Relator has no objection to the dismissal of Defendant Express Scripts Holding Company, without prejudice.

Dated: January 20, 2023

Respectfully submitted,

By: /s/ Roger A. Lewis
Roger A. Lewis

David J. Chizewer (PHV)
Roger A. Lewis (PHV)
Benjamin W. Chertok (pending PHV)
GOLDBERG KOHN LTD.
55 East Monroe Street – Suite 3300
Chicago, Illinois 60603
(312) 201-4000
david.chizewer@goldbergkohn.com
roger.lewis@goldbergkohn.com
benjamin.chertok@goldbergkohn.com

Ross H. Hyslop (CSB #149358)
PESTOTNIK LLP
501 West Broadway – Suite 1025
San Diego, California 92101
(619) 237-3000
hyslop@pestotnik.com

*Counsel for Plaintiff-Relator 3729, LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on January 20, 2023, to all counsel of record who have consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4. Any other counsel of record will be served by electronic mail, facsimile and/or overnight delivery.

/s/ Roger A. Lewis

Roger A. Lewis