1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

SOUTHERN DISTRICT OF CALIFORNIA

10
11

UNITED STATES OF AMERICA, *ex rel*. 3729, LLC,

12

Plaintiff and Relator,

13

v.

14

EXPRESS SCRIPTS HOLDING COMPANY and EXPRESS SCRIPTS, INC.;

15
16

Defendants.

17

Case No.:  19-CV-1199 TWR (WVG)

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**

(ECF No. 55)

18
19

Presently before the Court is the Motion to Dismiss ("Mot.," ECF No. 55) filed by

20

Defendants Express Scripts Holding Co. ("ESHC") and Express Scripts, Inc. ("ESI")

21

(together, "Express"), as well as Plaintiff-Relator 3729, LLC's Response in Opposition to

22

("Opp'n," ECF No. 62) and Defendants' Reply in Support of ("Reply," ECF No. 67) the

23

Motion.  The Court is also in receipt of Defendants' ("Defs.' 1st Supp. Br.," ECF No. 72)

24

and Relator's ("Rel.'s 1st Supp. Br.," ECF No. 74) First Supplemental Briefs, filed in

25

response to the Court's February 13, 2023 Order (1) Requesting Supplemental Briefing,

26

and (2) Continuing Hearing, (*see* ECF No. 68), as well as Relator's ("Rel.'s 2d Supp. Br.,"

27

ECF No. 77) and Defendants' ("Defs.' 2d Supp. Br.," ECF No. 78) Second Supplemental

28

Briefs filed in response to two newly decided district court cases offered by Defendants for

the first time at oral argument, which was held on April 27, 2023.[1]  (*See* ECF No. 75; *see also* ECF No. 76 ("4/27/23 Tr.").)  Having carefully considered the Parties' arguments, Relator's Complaint for Violation of False Claims Act ("Compl.," ECF No. 1), those matters properly incorporated by reference and subject to judicial notice, and the applicable law, the Court **GRANTS** Defendants' Motion and **DISMISSES WITHOUT PREJUDICE** both Defendant ESHC and Relator's single cause of action for violation of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733, pursuant to the FCA's public-disclosure bar.

## BACKGROUND

### I.    Relator's Allegations[2]

#### A.    *The Tricare Program*

"Tricare provides health insurance benefits, including prescription drug coverage, to approximately 9.4 million eligible beneficiaries around the world, including active[-]duty service members, retirees, and their family members and dependents."  (*See* Compl. ¶ 22.) "Since October 1, 2013, Tricare has been managed by the Defense Health Agency [("DHA")] within [the Department of Defense ("DoD")]."  (*Id.* ¶ 23.)  "Prior to that date, the program was managed by DHA's predecessor agency, the Tricare Management Activity ("TMA")."  (*Id.*)

/ / /

/ / /

---

[1] The two cases were *United States ex rel. Sam Jones Co. v. Biotronik Inc.*, No. CV-17-1391 PSG (KSx), 2023 WL 2993409 (C.D. Cal. Jan. 4, 2023), *motion to amend denied*, 2023 WL 2993408 (C.D. Cal. Mar. 21, 2023), *appeal docketed*, No. 23-55361 (9th Cir. Apr. 18, 2023), and *Silbersher v. Allergan Inc.*, No. 18-cv-03018-JCS, 2023 WL 2593777 (N.D. Cal. Mar. 20, 2023) ("*Silbersher II*"), *appeal docketed*, No. 23-15613 (9th Cir. Apr. 25, 2023).  The Court already had independently encountered and considered both cases while preparing for the April 27, 2023 oral argument; nonetheless, the Court provided Relator an opportunity to address the authorities because Defendants had raised them for the first time at oral argument.

[2] For purposes of Defendants' Motion, the facts alleged in Relator's Complaint are accepted as true.  *See Vasquez v. Los Angeles Cty.*, 487 F.3d 1246, 1249 (9th Cir. 2007) (holding that, in ruling on a motion to dismiss, the Court must "accept all material allegations of fact as true").

### B.     The Parties

Defendant ESI is a wholly owned subsidiary of Defendant ESHC, (*see* Compl. ¶ 8), which was formed after the 2012 merger of ESI with Medco Health Solutions ("Medco"). (*See id.* ¶ 9.)  ESI is the largest pharmacy benefit manager ("PBM") in the United States, providing pharmacy services to over 85 million people nationwide.  (*See id.* ¶ 8.)  "Over 68,000 retail pharmacies—representing 98% of all retail pharmacies in the U.S.— participate in its pharmacy network."  (*Id.*)  "In 2017, ESI had 26,600 employees and a reported revenue of $100 billion."  (*Id.*)  "ESI also operates retail, mail-order, and specialty pharmacies, including the Tricare mail-order pharmacy located in Tempe, Arizona."  (*Id.*)

Relator 3729, LLC is a limited liability company, one principal of which was the Pharmacist-in-Charge ("PIC") of ESI's Tempe, Arizona mail-order pharmacy where Tricare prescriptions are processed.  (*See id.* ¶ 7.)  "Through his employment at the Tempe location from October 2009 until March 2018, he ha[d] first-hand knowledge of how [ESI's] mail-order pharmacy program operated," (*id.*), and "raised concerns . . . about the excessive medication dispensed on auto-refill."  (*See id.* ¶ 56; *see also id.* ¶¶ 88–89.) "Relator's other principals are senior executives of a technology company and have first-hand knowledge of [ESI's] member experiences, dispensing, and business practices."  (*Id.* ¶ 7.)

### C.     ESI's Tricare Contracts and Alleged Fraud

Beginning in 2003, ESI contracted with the DoD "to provide critical pharmacy services, including mail-order delivery of prescription drugs, to uniformed service members and their families enrolled in Tricare, the U.S. military's comprehensive health insurance program."  (*See* Compl. ¶ 1; *see also id.* ¶¶ 24, 34.)  ESI "has dispensed hundreds of millions of prescriptions pursuant to these contracts."  (*Id.* ¶ 24.)  "For example, in 2017, it dispensed 119,400,000 prescriptions to Tricare beneficiaries."  (*Id.*)

Between at least October 2009 and early 2018 (the "relevant period"), Relator alleges that ESI defrauded the DoD under these contracts in two ways:

/ / /

(1) [by] enrolling as many Tricare beneficiaries as possible in automatic delivery; and (2) [by] calibrating the logic of [ESI's] pharmacy dispensing software so that a full days-supply of each maintenance prescription was automatically dispensed at the 67% usage date (*e.g.*, 60 days on a 90-day supply), with the refill "clock" immediately reset after each refill for the life of a prescription.[3]

(*See id.* ¶ 3; *see also id.* ¶¶ 34–42, 44–45, 53, 60, 63–68, 72–73.)  According to Relator, "this auto-refill pattern caused an excess of 265 pills—an extra nine-month supply—to be dispensed for each prescription over the course of a year . . . generating enormous piles of drug waste."  (*See id.* ¶ 3; *see also id.* ¶ 44.)  The excess between the amount of pills a beneficiary received of each maintenance drug on auto-refill from ESI over the amount originally prescribed by the beneficiary's physician is depicted in Exhibit 1 below:

/ / /

/ / /

/ / /

/ / /

/ / /

---

[3] "[F]rom at least 2009 until approximately 2014, [ESI] used its own proprietary software to dispense prescription drugs." (Compl. ¶ 54.)  "This software was fully customizable and calibrated to dispense excessive quantities of prescription drugs on auto-refill by employees at the [ESI] mail-order pharmacy in Tempe, Arizona." (*Id.*)  "In 2014, following the merger of [ESI] and Medco in April 2012, [ESI] rolled out a new dispensing software called 'Foundation 14' (or, simple, "F-14") that was built from the system previously used at Medco pharmacies." (*Id.* ¶ 55.)  "The new F-14 dispensing software was deliberately calibrated to carry forward the automatic refill dispensing practice described above that was previously established on the older [ESI] platform[] and was implemented at all [ESI] pharmacy locations, including at the Tricare mail-order pharmacy in Tempe, Arizona." (*Id.*)  "In late 2017 or early 2018, . . . [ESI] finally changed the logic of its dispensing software" such that "only the first refill ships at day 60 of a 90-day supply . . . [but], the second refill and all subsequent refills ship out on day 90 of a 90-day supply." (*See id.* ¶ 110.)

ESI's dispensing software also "employed various 'profiles' that dictated when a refill would ship." (*See id.* ¶ 59.)  "[ESI] placed beneficiaries on different profiles depending, for instance, on the beneficiary's insurer." (*Id.*)  "Beneficiaries with private insurance were mailed auto-refill medications at the 75% usage date instead of the 67% usage date for Tricare, reducing the financial impact of [ESI's] over-dispensing practices on private insurers." (*Id.*)

19-CV-1199 TWR (WVG)

1

### Exhibit 1



(*See id.* ¶ 3.)

"[ESI] knew that its practice was resulting in a rapidly growing quantity of unused and unneeded medication." (*Id.* ¶ 60.)  ESI received multiple complaints from Tricare beneficiaries, (*see id.* ¶¶ 49–52, 91–93), and, because "state pharmacy boards typically establish a one-year expiration period for most medications[, b]y the middle of the second year of a 90-day maintenance prescription, the original drugs dispensed by [ESI] on auto-refill and still in the beneficiary's possession were expired." (*See id.* ¶ 43.)  Further, when ESI served as a PBM on the commercial side of its business, it closely monitored the amounts of drugs its network pharmacies dispensed, identifying as "discrepant" claims for refills in excess of the numbers of fills indicated on the original prescription, where the quantity of drugs exceed[ed] the amount written on the prescription or the days' supply submitted by the pharmacy, or that attempted to auto-refill a prescription earlier than allowed.  (*See id.* ¶¶ 116–21.)

"[ESI] also knew that, as a consequence of [its] practice, Tricare would bear additional and unnecessary costs in the form of extra dispensing fees, claims processing fees, and purchases of additional drugs to replenish the United States' supply." (*See id.* ¶ 45; *see also id.* ¶¶ 5, 130.)  "DoD/Tricare paid [ESI] an administrative fee of approximately $17 each time it dispensed a drug through mail-order delivery to a Tricare beneficiary." (*Id.* ¶ 76.)  "Because of the vast number of beneficiaries enrolled in the Tricare pharmacy program—approximately 9.4 million beneficiaries in 2018—and the even larger number of prescriptions processed, even a slight increase in the number of dispensing events per prescription had the potential to dramatically increase [ESI's] total revenue from the Government." (*Id.* ¶ 77 (footnote omitted).)  ESI's auto-refill practices allowed it to collect "two extra dispensing fees for each 90-day supply maintenance drug over the course of a year." (*See id.* ¶ 84.)  Relator estimates that "between 2009 and 2017, [ESI] was paid approximately $6.3 billion in dispensing fees, at least $1.8 billion of which (28.57%) was for excessive and medically unnecessary fills," (*see id.* ¶ 122 (footnote omitted)), and, over the same period, "the total cost of replenishing DoD's prescription drug supply was in the billions of dollars." (*See id.* ¶ 123.)

Not only was ESI's "scheme . . . not easily detectable," (*see id.* ¶ 84), but ESI "hid its conduct from [the] DoD and Tricare." (*See id.* ¶ 5; *see also id.* ¶ 34.)  For example, ESI "concealed its fraudulent pharmacy practices from the DoD during an audit performed by the DoD Inspector General [("IG")] in 2013/14," (*see id.* ¶ 94; *see also id.* ¶¶ 95–105), such as data regarding waste. (*See id.* ¶ 103.)  Additionally, "[i]n or around 2015, the DoD contacted [ESI] and raised concerns about seven specific Tricare beneficiaries who had received excessive quantities of maintenance prescription medications." (*See id.* ¶ 106.)  "[ESI] employees . . . omitted telling the DoD investigators that one possible cause of the excess dispensing was how the F-14 software had been calibrated." (*See id.* ¶ 109.)

"In late 2017 or early 2018," (*see id.* ¶ 110), ESI "changed its auto-refill practices to avoid detection." (*See id.* ¶ 114.)  This change coincided with at increase in Tricare beneficiaries' co-payment responsibility from $0 to $7 per fill effective February 1, 2018,

19-CV-1199 TWR (WVG)

which would likely have prompted increased beneficiary complaints regarding excess medication, thereby tipping off DoD and/or Tricare auditors.  (*See id.*)

### D.   ESI's Contractual and Legal Obligations

According to Relator, ESI's conduct "violated 32 C.F.R. § 199.9(c)(5), as well as other state and federal regulations and pharmacy standards."  (*See* Compl. ¶ 4; *see also id.* ¶¶ 35, 46, 58, 69, 74–75.)  "[ESI] and other Tricare providers must take steps to prevent, detect, and correct fraud, waste, and abuse in the Tricare pharmacy program," (*id.* ¶ 25 (citing 32 C.F.R. § 199.21); *see also id.* ¶ 47), and "must adhere to the Tricare Provider Manual, which requires that all entities and individuals serving Tricare beneficiaries comply with all Tricare program regulations, policies, and procedures."  (*See id.* ¶ 28.)  Tricare regulations define "fraud" to include "claims for services which would be covered except for the frequency . . . of the services," *see* 32 C.F.R. § 199.9(c)(2), and "claims which involve flagrant and persistent overutilization of services without proper regard for results, the patient's ailments, condition, medical needs, or the physician's orders," *see* 32 C.F.R. § 199.9(c)(5).  (*See* Compl. ¶¶ 26–27; *see also id.* ¶¶ 35, 46, 58, 69, 74.)

PBMs and pharmacies that do business with the DoD must also "abide by state pharmacy regulations when providing pharmacy services to Tricare beneficiaries."  (*See id.* ¶ 29.)  "[ESI] operates its Tricare mail-order pharmacy program from a facility in Tempe, Arizona."  (*See id.* ¶ 30.)  "Arizona regulations require pharmacies to conduct a final accuracy check to ensure, among other things, that the dispensation is 'consisten[t] with prescription order.'"  (*Id.* ¶ 31 (alteration in original) (quoting Ariz. Admin. Code R4-23-402(A)(11)); *see also id.* ¶ 75.)  "The pharmacy must also '[v]erify the legality and pharmaceutical feasibility of dispensing a drug[,]' including on the basis of 'the frequency of refills.'"  (*Id.* (first alteration in original) (quoting Ariz. Admin. Code R4-23-6 402(A)(5)); *see also id.* ¶¶ 61, 75.)  "In addition, Arizona pharmacies must ensure that medications are dispensed in legal quantities in accordance with the prescriber's orders."  (*Id.* ¶ 32 (citing Ariz. Admin. Code R4-23-402(A)(10)).)

/ / /

Finally, ESI "is also subject to the pharmacy regulations of those states where Tricare beneficiaries reside and [ESI] dispenses prescription drugs." (*See id.* ¶ 33.) "Tricare beneficiaries reside throughout the United States and abroad." (*Id.*) "Some of these states, including Florida, Montana, Oklahoma, New Hampshire, and Vermont, expressly require pharmacists to prevent over-utilization of drugs." (*Id.* ¶ 33 & n.7 (citing Fla. Admin. Code Ann. 64B16-27.810(1)–(2); Mont. Admin. R. 24.174.902; N.H. Admin. Code Ph. 501.01(b)(2); Okla. Admin. Code 535:10-9-1.2; Vt. Admin. Code 20-4-1400:10.30); *see also id.* ¶ 62.) On April 7, 2016, for example, ESI "signed a Consent Order with the Board of Pharmacy of the State of Oregon[,]" under which ESI "agreed to pay a penalty of $30,000 and submit a Quality Assurance plan to address accumulation of refilled prescriptions which are refilled too soon." (*See id.* ¶ 48.)

## II.   Relevant Procedural History

On June 26, 2019, Relator initiated this action by filing its Complaint under seal, asserting a single cause of action for violation of the FCA, 31 U.S.C. §§ 3729(a)(1)(A)–(B). (*See generally* ECF No. 1.) Plaintiff the United States of America declined to intervene on June 16, 2022, (*see generally* ECF No. 18), following which the Court ordered the Complaint to be unsealed and served on Defendants. (*See generally* ECF No. 19.)

Relator served Defendants through their authorized agents in mid-October 2022, (*see generally* ECF Nos. 33, 34), following which Defendants filed the instant Motion on December 15, 2022. (*See generally* ECF No. 55.) On February 13, 2023, the Court ordered supplemental briefing "addressing which version of the public-disclosure bar applies and the consequences, if any, of the differences in the 1986 and 2010 versions of the public-disclosure bar on the arguments presented in their Motion." (*See* ECF No. 68 at 2.)

## LEGAL STANDARDS

## I.   Federal Rule of Civil Procedure 12(b)(1)

A party may challenge the court's subject-matter jurisdiction through a motion filed pursuant to Federal Rule of Civil Procedure 12(b)(1). *See* Fed. R. Civ. P. 12(b)(1); *see also White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). Because "[f]ederal courts are

courts of limited jurisdiction," "[i]t is to be presumed that a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Consequently, "the burden of establishing the contrary rests upon the party asserting jurisdiction." *Id.*

"Rule 12(b)(1) jurisdictional attacks can be either facial or factual." *White*, 227 F.2d at 1242. "A 'facial' attack accepts the truth of the plaintiff's allegations but asserts that they 'are insufficient on their face to invoke federal jurisdiction.'" *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (quoting *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004)). "The district court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." *Id.* (citing *Pride v. Correa*, 719 F.3d 1130, 1133 (9th Cir. 2013)).

"A 'factual' attack, by contrast, contests the truth of the plaintiff's factual allegations, usually by introducing evidence outside the pleadings." *Id.* (citing *Safe Air for Everyone*, 373 F.3d at 1039; *Thornhill Publ'g Co. v. Gen. Tel. & Elec. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979)). "When the defendant raises a factual attack, the plaintiff must support her jurisdictional allegations with 'competent proof[]'" and "prov[e] by a preponderance of the evidence that each of the requirements for subject-matter jurisdiction has been met." *Id.* (citing *Hertz Corp. v. Friend*, 559 U.S. 77, 96–97 (2010); *Harris v. Rand*, 682 F.3d 846, 851 (9th Cir. 2012)). "With one caveat, if the existence of jurisdiction turns on disputed factual issues, the district court may resolve those factual disputes itself." *Id.* at 1121–22 (citing *Safe Air for Everyone*, 373 F.3d at 1039–40; *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983); *Thornhill Publ'g*, 594 F.2d at 733). "The caveat is that a court must leave the resolution of material factual disputes to the trier of fact when the issue of subject-matter jurisdiction is intertwined with an element of the merits of the plaintiff's claim." *Id.* at 1122 n.3 (citing *Safe Air for Everyone*, 373 F.3d at 1039–40; *Augustine*, 704 F.2d at 1077).

## II.    Federal Rule of Civil Procedure 12(b)(6)

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). "A district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is proper if there is a 'lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.'" *Id.* at 1242 (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)).

"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In other words, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

"Rule 9(b) requires that, when fraud is alleged, 'a party must state with particularity the circumstances constituting fraud.'" *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124

(9th Cir. 2009) (quoting Fed. R. Civ. P. 9(b)). "Rule 9(b) demands that the circumstances constituting the alleged fraud be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong." *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001)). "Averments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged." *Id.* (internal quotation marks omitted) (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)).

"If a complaint is dismissed for failure to state a claim, leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)). "A district court does not err in denying leave to amend where the amendment would be futile." *Id.* (citing *Reddy v. Litton Indus.*, 912 F.2d 291, 296 (9th Cir. 1990), *cert. denied*, 502 U.S. 921 (1991)).

## ANALYSIS

Through the instant Motion, Defendants seek to dismiss Relator's Complaint on the grounds that it is foreclosed by the public-disclosure bar and fails to state a claim.[4] (*See generally* Mot.; ECF No. 55-1 ("Mem.").) Because the Court concludes that dismissal is warranted under the public-disclosure bar, the Court does not reach the sufficiency of Relator's allegations.

/ / /

---

[4] Defendants also seek dismissal of ESHC. (*See* ECF No. 55-1 ("Mem.") at 23–24.) "Relator does not object to the dismissal, without prejudice, of ESHC based on Defendants' claim that 'ESHC is a holding company with no employees or operations[,] and it is incapable of engaging in any conduct.'" (*See* Opp'n at 2 n.1 (quoting Mem. at 24).) Although Defendants seek dismissal of ESHC with prejudice as to Relator, (*see* Mem. at 24), the Court agrees with Relator that dismissal without prejudice is appropriate so that Relator may "test [Defendants'] claim in discovery." (*See* Opp'n at 2 n.1.) The Court therefore **DISMISSES WITHOUT PREJUDICE** Defendant ESHC.

19-CV-1199 TWR (WVG)

Regarding the FCA's public-disclosure bar, Defendants contend that Relator's FCA cause of action must be dismissed because two sources publicly disclosed substantially the same allegations or transactions as alleged in Relator's Complaint.[5]  (*See generally* Mem. at 3–15; Defs.' 1st Supp. Br.)  Specifically, in December 2013, the *Army Times* published the following article entitled "DoD: Mail-order meds program may waste money" (the "*Army Times* article"):

> A Pentagon report says the contractor that manages Tricare's pharmacy benefit may be wasting money by continuing to ship drugs to beneficiaries who no longer need them or dispensing 90-day, instead of 30-day, prescriptions.
>
> The report by the Defense Department Inspector General found that Tricare's Mail Order Pharmacy program costs the government and beneficiaries less money than retail stores.  But the IG also noted it had no data on how much medicine is wasted by the program, managed by Express Scripts.

---

[5] For purposes of their argument regarding the FCA's public-disclosure bar, Defendants request that the Court take judicial notice of three documents: (1) an article published in the *Army Times* in December 2013, entitled "DoD: Mail-order meds program may waste money" (ECF No. 55-6 ("Ex. D")), (2) a December 2013 email chain between ESI and DHA personnel regarding the *Army Times* article (ECF No. 61 ("Ex. F") (filed under seal)), and (3) the DoD IG's Report No. DODIG-2018-033 titled "Defense Health Agency Controls Over High-Risk Pharmaceutical Payments." (ECF No. 55-9 ("Ex. G")).  (*See* ECF No. 55-2 ("Defs.' RJN") at 2–3.)  "The Court may consider judicially noticeable materials on a motion to dismiss[,]" *Silbersher v. Valeant Pharms. Int'l, Inc.*, 445 F. Supp. 3d 393, 400 (N.D. Cal. 2020) ("*Valeant*") (citing *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018)), and "[c]ourts may take judicial notice of publications introduced to indicate what was in the public realm at the time." *Id.* (quoting *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010)).) Relator does not object to Defendants' Request for Judicial Notice.

Although the Court may properly take judicial notice of the *Army Times* article and 2017 DoD IG's report, *see, e.g.*, *United States ex rel. Williams v. Med. Support L.A.*, No. CV-20-0198-CBM-DFMX, 2022 WL 15399977, at *8 n.4 (C.D. Cal. Sept. 26, 2022) (taking judicial notice of U.S. Department of Veterans Affairs OIG report for purposes of public-disclosure bar argument); *United States ex rel. Guzman v. Insys Therapeutic, Inc.*, No. 2:13-CV-05861-JLS-AJW, 2021 WL 4306020, at *3 (C.D. Cal. May 19, 2021) (taking judicial notice of news articles for purposes of public-disclosure bar argument), the email chain "do[es] not meet the applicable standard for judicial notice."  *See McDermott v. Palo Verde Unified Sch. Dist.*, 638 F. App'x 636, 638 n.1 (9th Cir. 2016); *accord Bonner Cnty. v. Little*, No. 1:20-CV-00350-REB, 2020 WL 8225362, at *5 (D. Idaho Dec. 9, 2020) ("The contents of such emails do not fit within the standard of Rule 201.").  The Court also does not rely on the 2017 DoD IG's report in this Order.  The Court therefore **GRANTS IN PART** Defendants' Request for Judicial Notice as to Exhibit D but **DENIES IN PART** Defendants' Request for Judicial Notice as to Exhibits F and G.

The National Community Pharmacy Association says that information is needed to know whether the home delivery system saves money.  And beneficiaries with up to a year's worth of drugs piled in medicine cabinets and linen closets are wondering, as well.

"They ship 90-day supplies after 60 days.  By the time I get 12 months into this, I have a nine-month supply of drugs.  And I don't dare stop the medications because they'll never get it started again," said retired Air Force Master Sgt. Wayne Stanfield, 70, of South Boston, Va.

Other problems noted by retirees using the Tricare Mail Order Program, or TMOP, include miscommunications with Express Scripts, mix-ups that have left beneficiaries without vital medications and some drugs being out of stock.

The IG found that between April and June 2012, TMOP saved the Pentagon nearly 17 percent over Tricare's retail pharmacy option: $399 million versus nearly $466 million at retail stores, according to the Pentagon.

But the analysis did not include such items as contract costs and administrative overhead associated with mail order or retail prescriptions – or data on waste.

Stanfield received four prescriptions by mail, and his wife receives 10.  They reluctantly switched to mail order in 2012 when their copayments through retail pharmacies increased to $5 for generics and $12 for brand names.

At first, the refills ran smoothly, Stanfield said.  But in early 2013, Express Scripts changed its website customer interface and made it "nearly impossible to reach the company," he said.  Emails arrive in his inbox informing him a prescription needs to be renewed, but don't specify the drug's name or the beneficiary.  Phone messages are left on his voice mail, also without any names or specific details.

"Why is there this push to make it mandatory when the program is broken?  Somebody needs to look at Express Scripts.  They are making a fortune off the government, and there are a tremendous amount of retirees who are getting chewed up by the system," Stanfield said.
At press time, Express Scripts had not responded to questions submitted by email or to a telephone request for an interview.

Within the next year, Tricare For Life beneficiaries will be required to try TMOP for long-term maintenance drugs for at least a year.

19-CV-1199 TWR (WVG)

According to the Pentagon, Tricare for Life beneficiaries make up 22 percent of the Tricare population but account for 53 percent of Tricare's yearly pharmacy costs. Public Health Service Rear Adm. Thomas McGinnis, Tricare's pharmacy chief, said the mandatory mail order policy could save DoD at least $200 million a year.

Retirees, however, continue to question the math and the program. Retired Navy Chief Petty Officer Donald Shafer, of Wasilla, Alaska, said he sometimes receives notices that Express Scripts is out of stock of his medication.

"I'm forced to purchase the drugs locally at a much higher price," Shafer said. "What happens when Express Scripts is the only option? I agree long-term maintenance drugs can be obtained through Express Scripts, but only after they get their act together."

A 2012 survey by the Military Officers Association of American found that 75 percent of respondents – active or retired troops or family members – said they tried Tricare's home delivery. Of those, 92 percent said they were "mostly or very satisfied."

A review of Tricare data showed that in 2011, the average cost to the Defense Department of a mail-order prescription was $101.90, versus $72.96 at a retail pharmacy.

A Tricare official said Dec. 5 that Defense Health Agency officials are developing a plan to help Tricare For Life beneficiaries transfer their prescriptions when the program becomes mandatory.

He said a date has not yet been set for the start of the program.

(*See* ECF No. 55-6 ("Defs.' Ex. D).)

Second, on August 6, 2015, the DoD issued an interim final rule that would "require eligible covered [TRICARE] beneficiaries generally to refile non-generic prescription maintenance medications through military treatment facility pharmacies or the national mail-order pharmacy program." *See* Civilian Health and Medical Program of the Uniformed Services (CHAMPUS)/TRICARE: Refills of Maintenance Medications Through Military Treatment Facility Pharmacies or National Mail Order Pharmacy

14

Program, 80 Fed. Reg. 46,796-01, 46,796 (Aug. 6, 2015) (to be codified at 32 C.F.R. Part 199).  In response, "[a] professional association commented with a number of concerns," including "unnecessary waste resulting from auto-ship policies and the suggestion to implement policies to ensure mail order refills are approved and needed."  *See* Civilian Health and Medical Program of the Uniformed Services (CHAMPUS)/TRICARE: Refills of Maintenance Medications Through Military Treatment Facility Pharmacies or National Mail Order Pharmacy Program, 81 Fed. Reg. 76,307-01, 76,310 (Nov. 2, 2016) (to be codified at 32 C.F.R. Part 199).  In adopting the final rule (the "DoD final rule"), the DoD responded that it believed that "the current statutory requirement of Section 702 in the [Fiscal Year] 2015 [National Defense Authorization Act] requiring eligible covered beneficiaries generally to refill non-generic prescription maintenance medications through military treatment facility pharmacies or the national mail order program . . . is being implemented successfully and without adverse effects on beneficiaries."  *See id.*

Because Relator alleges that ESI's "fraudulent scheme . . . occurred from at least October 2009 until early 2018," (*see* Compl. ¶ 2), the 1986 version of the public-disclosure bar applies to claims submitted before March 23, 2010, and the 2010 version applies to claims submitted on or after that date.  (*See* ECF No. 68 at 2; Defs.' 1st Supp. Br. at 1; Rel.'s 1st Supp. Br. at 1.)  The 1986 version of the public disclosure bar provides:

> (A)   No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing[;] in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation[;] or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

> (B)   For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. §§ 3730(e)(4)(A)–(B) (1986).  The 2010 version, by contrast, provides:

(A)   The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed--

    (i)   in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;

    (ii)   in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or

    (iii)   from the news media,

unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B)   For purposes of this paragraph, "original source" means an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

31 U.S.C. §§ 3730(e)(4)(A)–(B) (2010).

The 2010 amendments "radically changed the 'hurdle' for relators." *United States ex rel. Silbersher v. Allergan Inc.*, 506 F. Supp. 3d 772, 788 (N.D. Cal. 2020) ("*Silbersher I*") (quoting *United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 298 (3d Cir. 2016)), *rev'd on other grounds*, 46 F.4th 991 (9th Cir. 2022).  As is relevant here, "[f]irst, the jurisdictional language in § 3730(e)(4)(A) has been removed, making the public disclosure bar an affirmative defense rather than a matter of jurisdiction." *Id.* (citing *Prather v. AT&T, Inc.*, 847 F.3d 1097, 1102 (9th Cir.), *cert. denied*, 137 S. Ct. 2309 (2017)).  Further, "the definition of an 'original source' no longer contains a 'direct' knowledge requirement, instead requiring that an original source have 'knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions.'" *Id.* at 789 (citing 31 U.S.C. § 3730(e)(4)(B)).

1    "Under both versions of the public disclosure bar, § 3730(e)(4) involves a two-step

2    inquiry." *United States ex rel. Calva v. Impac Secured Assets Corp.*, No. SA-CV-16-1983-

3    JVS-JCGX, 2018 WL 6016152, at *3 (C.D. Cal. June 12, 2018).  "First, the Court must

4    determine whether there was a prior 'public disclosure' of the allegations or transactions

5    underlying the *qui tam* suit through one of the enumerated sources." *Id.* (citing 31 U.S.C.

6    § 3730(e)(4)(A) (1986 & 2010 versions)).  "If there has been a public disclosure, the Court

7    must then determine whether the relator is an 'original source' within the meaning of the

8    statute." *Id.* (citing 31 U.S.C. § 3730(e)(4)(A) (1986 & 2010 versions)).  Here, Defendants

9    challenge both whether Relator (1) alleges allegations or transactions that were publicly

10   disclosed, and, if so, (2) is the original source of the information.  (*See* Mem. at 3–15.)

## I.    Public Disclosure

12   Public disclosure under either version of the statute requires that "three things are

13   true: (1) the disclosure at issue occurred through one of the channels specified in the statute;

14   (2) the disclosure was 'public'; and (3) the relator's action is 'based upon' the allegations

15   or transactions publicly disclosed." *United States ex rel. Mateski v. Raytheon Co.*, 816

16   F.3d 565, 570 (9th Cir. 2016) (quoting *Malhotra v. Steinberg*, 770 F.3d 853, 858 (9th Cir.

17   2014) (quoting 31 U.S.C. § 3730(e)(4)(A) (1986))); *accord Allergan*, 46 F.4th at 996

18   ("[T]oday, we reaffirm that essential elements of the test for triggering the public disclosure

19   bar [under the 2010 statute] we used in *Solis*: that (1) the disclosure at issue occurred

20   through one of the channels specified in the statute; (2) the disclosure was public; and

21   (3) the relator's action is substantially the same as the allegation or transaction publicly

22   disclosed." (quoting *United States ex rel. Solis v. Millennium Pharms., Inc.*, 885 F.3d 623,

23   626 (9th Cir. 2018))).  Relator does not dispute that the *Army Times* article and DoD final

24   rule were public disclosures occurring through one of the channels specified by the public-

25   disclosure bar.  (*See* Opp'n at 8–12; Rel.'s 1st Supp. Br. at 2.)  Instead, the Parties dispute

26   only whether Relator's Complaint is "based upon" the "allegations or transactions"

27   publicly disclosed through these sources.  "This depends on: (A) whether the publicly

28   available  information  about  [ESI's  auto-refill  prescription  practices  for  Tricare

beneficiaries] contained an 'allegation or transaction' of fraud; and, if so, (B) whether [Relator]'s Complaint was 'based upon' said 'allegation or transaction.'" *See Mateski*, 816 F.3d at 570 (citing *United States ex rel. Zizic v. Q2Administrators, LLC*, 728 F.3d 228, 235 (3d Cir. 2013)).

### A.   *"Allegations or Transactions"*

"The False Claims Act's public disclosure bar uses the terms 'allegations' and 'transactions' without defining either term." *Mateski*, 816 F.3d at 570–71 (citing 31 U.S.C. § 3730(e)(4)(A)). "Courts have interpreted 'allegation' to refer to a direct claim of fraud, and 'transaction' to refer to facts from which fraud can be inferred." *Id.* at 571 (citing *Zizic*, 728 F.3d at 235–36; *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 653–54 (D.C. Cir. 1994)).

"For purposes of the public disclosure bar, [the Ninth Circuit] ha[s] held that [t]he substance of the disclosure . . . need not contain an explicit allegation of fraud, so long as the material elements of the allegedly fraudulent transaction are disclosed in the public domain." *Id.* (third and fourth alterations in original and internal quotation marks omitted) (quoting *United States ex rel. Found. Aiding Elderly v. Horizon W.*, 265 F.3d 1011, 1014 (9th Cir. 2001), *amended on denial of reh'g*, 275 F.3d 1189 (9th Cir.2001)) (citing *A-1 Ambulance Serv., Inc. v. California*, 202 F.3d 1238, 1243 (9th Cir. 2000)).

> [I]f X + Y = Z, Z represents the allegation of fraud and X and Y represent its essential elements.  In order to disclose the fraudulent transaction publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, i.e., the conclusion that fraud has been committed.

*Id.* (alteration in original) (quoting *Found. Aiding*, 265 F.3d at 1015).  The Ninth Circuit "ha[s] further explained that, in a fraud case, X and Y inevitably stand for but two elements: a misrepresented state of facts and a true state of facts." *Id.* (internal quotation marks omitted) (quoting *Found. Aiding*, 265 F.3d at 1015).  "[T]o invoke the [public-disclosure] bar, a defendant must show that the transaction . . . [is] one in which a set of misrepresented

/ / /

1  facts has been submitted to the government." *Id.* (second and third alterations in original
2  and internal quotation marks omitted) (quoting *Found. Aiding*, 265 F.3d at 1016–17).

3      Defendants contend that the *Army Times* article and the comments to which the DoD
4  responded in the DoD final rule publicly disclosed ESI's allegedly fraudulent transactions.
5  (*See* Mem. at 5–7; Reply at 2–5.)  Specifically, "both the *Army Times* article and [Relator]'s
6  Complaint identify the same key aspects of the alleged fraudulent scheme: (1) ESI
7  automatically provided patients with 90-day supplies of medication after 60 days; and
8  (2) as a result, patients received nine months of extra medication within a year and
9  accumulated unneeded medicine." (*See* Mem. at 7.)  Similarly, "[b]oth the comments [to
10  the DoD final rule] and the Complaint contain allegations of excessive refills causing
11  unnecessary waste, including through automatic refills being shipped without express
12  authorization." (*See id.* at 9.)  Relator responds that "[n]either the *Army Times* nor the
13  Federal Register['s DoD final rule] . . . published 'facts from which fraud can be inferred,'
14  so neither source disclosed the same 'transactions' as those detailed in the Complaint."
15  (*See* Rel.'s 1st Supp. Br. at 2.)  Indeed, "[u]nlike the *Army Times* and the Federal
16  Register['s DoD final rule], the Complaint alleges that ESI did not just over-supply one
17  military veteran, but schemed to oversupply *all* members signed up for mail-order delivery
18  globally, and did so *intentionally* through orchestration by its top executives and execution
19  at every level of its business." (*See id.* at 2–3 (emphasis in original).)

20      The Court concludes that the *Army Times* article and the DoD final rule disclosed
21  the allegedly fraudulent transactions at issue here.  Despite Relator's attempts to narrow
22  the scope of the *Army Times* article to a single instance of over dispensing prescription
23  medication, the article opens with the findings of a July 2013 DoD IG report:  "A Pentagon
24  report says the contractor that manages Tricare's pharmacy benefit may be wasting money
25  by continuing to ship drugs to beneficiaries who no longer need them or dispensing 90-
26  day, instead of 30-day, prescriptions." (*See* Ex. D.)  The *Army Times* article also reported
27  that the IG report "did not include such items as contract costs and administrative overhead
28  associated with mail order or retail prescriptions – or data on waste."  (*See id.*)

19

Nonetheless, "[t]he National Community Pharmacy Association says that information is needed to know whether the home delivery system saves money.  And beneficiaries with up to a year's worth of drugs piled in medicine cabinets and linen closets are wondering, as well."  (*See id.*)  One beneficiary reported "[t]hey ship 90-day supplies after 60 days.  By the time I get 12 months into this, I have a nine-month supply of drugs."  (*See id.*)  Between he and his wife, his household had fourteen prescriptions.  (*See id.*)  He added that "[s]omeone needs to look at Express Scripts.  They are making a fortune off the government."  (*See id.*)  Indeed, despite the DoD's claims that mandatory mail order prescriptions for maintenance drugs could save money, "[r]etirees . . . continue to question the math and the program."  (*See id.*)  The DoD final rule also noted the "concerns" of "[a] professional association" regarding, among other things, "unnecessary waste resulting from auto-ship policies and the suggestion to implement policies to ensure mail order refills are approved and needed."  *See* 81 Fed. Reg. at 76,310.  In short, the *Army Times* article and DoD final rule include facts that the TMOP program auto-ships a 90-day supply every sixty days for at least some prescriptions; that ESI is profiting off its contract with the government and, presumably, even more so because of its auto-ship and premature refill practices; and that the DoD is missing data on "contract costs and administrative overhead" and "waste."

The *Army Times* article is similar to the *New York Times* article that the district court concluded triggered the public-disclosure bar in *Sam Jones*.  *See* 2023 WL 2993409 at *6–8.  In *Sam Jones*, the alleged fraud involved "fraudulent nepotistic hiring and compensation practices" regarding the defendant's marketing of its cardiac rhythm management implant products.  *See id.* at *6.  The *New York Times* article noted how the Department of Justice had been investigating the defendant's sales and marketing products but that the defendant had disclaimed any wrongdoing.  *See id.*  Nonetheless, "[t]he article . . . [went] on to describe internal [defendant] documents that offer[ed] a possible explanation for [the defendant]'s market share increase other than better products: 'the company's success in developing relationships with doctors who, in turn, c[ould] influence

which brand of device a patient gets.'"  *See id.*  One of the tactics discussed in the article was "the hiring of a physician's family member."  *See id.*  The court focused in particular on one passage of the article:

> Under [a new] law, medical products companies will have to disclose the fees they pay to doctors for services like consulting or speaking engagements.  But the new law will not shed light on what the [defendant] documents indicate is a widely used industry practice: the hiring by a device maker of a doctor's spouse or other relative.  For example, in plotting strategies to gain sales at one California hospital, [defendant] officials suggested that an implant specialist, whose son and wife both worked for a competitor, might be wooed if [the defendant] offered him concessions "such as studies or even the hiring of his son," according to an internal company report.  Another company document discussed how the revenues of a sales official sharply dropped after his father, an implant specialist, died unexpectedly in an airplane crash.

*See id.* at *7 (first alteration in original).  The court concluded "[t]hat paragraph [of the article], read in context, [wa]s sufficient to infer fraud" because "[t]he article reveal[ed] that [the defendant] had likely engaged in unlawful nepotistic hiring practices to increase device sales (alleged true facts), while publicly claiming that its sales success was based on better products and proper relationships with doctors (alleged misrepresented facts)."  *See id.*  "It thus t[ook] only a small inferential step to conclude the article implies that [the defendant] and colluding medical providers were misrepresenting to the health-care industry and federal government the reasons for [defendant]-made devices being implanted into patients."  *See id.*

Relator attempts to distinguish *Sam Jones*, arguing "the explosive *NYT* article there detail[ed] *fraud* as compared to the tepid, terse *Army Times* article and [the DoD final rule in the] Federal Register here alleging, at most, *potential contract breaches* (not fraud)."  (*See* Rel.'s 2d Supp. Br. at 2 (emphasis in original).)  As in the *Army Times* article, however, the *New York Times* article in *Sam Jones* never explicitly referenced "fraud."  *See generally* Barry Meier, *Sales Tactics on Implants Raise Doubts*, N.Y. Times (May 21, 2011), https://www.nytimes.com/2011/06/01/health/01device.html.  Rather, "[t]he article constitute[d] a 'transaction' because it disclose[d] sufficient facts implying that [the

defendant had] engaged in fraudulent . . . practices." *See Sam Jones*, 2023 WL 2993409 at *6. Such is the case here, where "only a small inferential step" is required to conclude that ESI was misrepresenting the number of refills authorized by physicians and needed by Tricare beneficiaries to increase its profits under its contracts with the DoD. Accordingly, the Court concludes that the *Army Times* article and DoD final rule publicly disclosed ESI's allegedly fraudulent transactions. *See also, e.g.*, *United States ex rel. Sanches v. City of Crescent City*, No. C 08-05663 MEJ, 2010 WL 4696835, at *5 (N.D. Cal. Nov. 10, 2010) (concluding that staff report indicating that the defendant municipal housing authority's "administrative fees reserve ha[d] accumulated funds exceeding the required 105% cap" contained the material elements of fraud).

### B.   *"Based Upon"*

"[F]or a relator's allegations to be 'based upon' a prior public disclosure, 'the publicly disclosed facts need not be identical with, but only substantially similar to, the relator's allegations.'" *Mateski*, 816 F.3d at 573 (citing *United States ex rel. Meyer v. Horizon Health Corp.*, 565 F.3d 1195, 1199 (9th Cir. 2009), *overruled on other grounds by United States ex rel. Hartpence v. Kinetic Concepts, Inc.*, 792 F.3d 1121, 1128 n. 6 (9th Cir. 2015); *Malhotra*, 770 F.3d at 858). "Nor does a disclosed allegation need to contain every specific detail to constitute a disclosure." *Amphastar Pharms. Inc. v. Aventis Pharma SA*, 856 F.3d 696, 704 (9th Cir. 2017). Further, "[t]he absence of any explicit allegation of wrongdoing in the prior public disclosure 'is simply of no moment' so long as 'the material transactions giving rise to the [defendant's] allegedly unlawful . . . schemes were publicly disclosed.'" *Solis*, 885 F.3d at 627 (second and third alteration in original) (citing *A-1 Ambulance*, 202 F.3d at 1245; *United States v. Alcan Elec. & Eng'g, Inc.*, 197 F.3d 1014, 1019–20 (9th Cir. 1999)). "[A]nother way of thinking about substantial similarity" is to "ask[] whether the Government was on notice to investigate the fraud before the relator filed his complaint." *See Mateski*, 816 F.3d at 574.

"[W]hether [a FCA c]omplaint is substantially similar to prior public reports depends on the level of generality at which the comparison is made." *Id.* at 575. The Ninth

Circuit has cautioned that *"viewing FCA claims 'at the highest level of generality . . . in order to wipe out qui tam suits that rest on genuinely new and material information is not sound.'" Id.* at 577 (emphasis and alteration in original) (quoting *Leveski v. ITT Educ. Servs., Inc.*, 719 F.3d 818, 831 (7th Cir. 2013)).  This is because "the purpose of the public disclosure bar [is to] 'strik[e] *a balance* between encouraging private persons to root out fraud and stifling parasitic lawsuits." *See id.* (quoting *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 413, (2011)).

Consequently, the public disclosure bar does not apply where the relator's complaint "alleges fraud that is different in kind and in degree from the previously disclosed information." *See id.* at 578 (citing *Hagood v. Sonoma Cnty. Water Agency*, 81 F.3d 1465, 1475 (9th Cir. 1996)).  Conversely, the public disclosure bar does apply where the relator's complaint and the prior disclosure "are similar in kind, even if slightly less so in degree." *See Solis*, 885 F.3d at 627.  In other words, complaints that provide "specific examples" of previously disclosed "general problems" and "relators who provide the Government with genuinely new and material information of fraud [should be allowed] to move forward with their *qui tam* suits." *See Mateski*, 816 F.3d at 578–79.

Not surprisingly, Defendants contend that the *Army Times* article and DoD final rule were sufficient to "put the government on notice to investigate the fraud" alleged by Relator, (*see* Defs.' 1st Supp. Br. at 3 (citing *Solis*, 885 F.3d at 626; *Amphastar Pharms.*, 856 F.3d at 703)), while Relator argues that "[t]he allegations in the Complaint are . . . 'different in kind and in degree from the previously disclosed information,'" (*see* Rel.'s 1st Supp. Br. at 4 (quoting *United States ex rel. Jahr v. Tetra Tech EC, Inc.*, No. 13-cv-03835-JD, 2022 WL 2317268, at *9 (N.D. Cal. June 28, 2022)) (citing *Mateski*, 816 F.3d at 567–69 & n.7)), and "merely put[] the government 'on the trail' to initiate an investigation into potential contract or legal breaches."  (*See* Rel.'s 2d Supp. Br. at 2.)  Upon consideration of the Parties' authorities, the Court concludes that Relator's allegations are substantially similar to those disclosed by the *Army Times* article and DoD final rule.  As in *Solis* and *Sam Jones*, "the same actors, the same conduct, and the same risk were

involved in both the prior disclosure and relator's complaint." *See Sam Jones*, 2023 WL 2993409, at *7 (concluding that both the article and the relator's complaint involved the same "main actor and set-out the same core charge" of fraud (citing *Solis*, 885 F.3d at 626)). "And while the complaint contained more detail than the previous disclosure, . . . both sets of allegations were 'similar in kind, even if slightly less so in degree,' and '[t]he prior disclosure need not be identical with [the] allegations to bar [the] claim.'" *See id.* (second and third alteration in original) (quoting *Solis*, 885 F.3d at 627)). Ultimately, "[t]hey are close enough in kind and degree to have put the government on notice to investigate the alleged fraud before [relator] filed his complaint." *See id.* at *8 (alterations in original) (quoting *Solis*, 885 F.3d at 627).

Further, "[u]nlike in *Mateski*, here there is a disclosure of more than only 'very generalized problems,'" because the *Army Times* article and DoD final rule "pointed to the specific tactic of" auto-refilling a full, 90-day supply of medication every 60 days. *See Sam Jones*, 2023 WL 2993409, at *8. "So unlike in *Mateski*, the article's disclosure and the [Complaint's] allegations are not so different in *both* kind and degree." *See Sam Jones*, 2023 WL 2993409, at *8 (emphasis in original); *see also, e.g.*, *Jahr*, 2022 WL 2317268, at *9–10 (concluding that three "fairly general" local media reports that "specifically disclose[d]" that the defendant had transported dirt from contaminated sites without testing for radiation barred false claims acts alleging the same misconduct). "Rather, the article 'alerted the Government to the specific areas of fraud alleged.'" *See Sam Jones*, 2023 WL 2993409, at *8 (first citing *Mateski*, 816 F.3d at 579; then citing *Solis*, 885 F.3d at 626).

Although the *Army Times* article and DoD final rule lack the detail contained in Relator's Complaint, they ultimately "are similar in kind, even if slightly less so in degree," *see Solis*, 885 F.3d at 627, and sufficed to put the DoD "on notice to investigate the fraud before the relator filed his complaint." *See Mateski*, 816 F.3d at 574. Accordingly, the Court concludes that the *Army Times* article and DoD final rule constitute public disclosures.

/ / /

19-CV-1199 TWR (WVG)

## II.     Original Source

Because the *Army Times* article and DoD final rule publicly disclosed the allegedly fraudulent conduct underlying Relator's Complaint, Relator's action can proceed only if Relator qualifies as an "original source." 31 U.S.C. § 3730(e)(4)(B). Given changes to the definition of the term "original source," *see Silbersher I*, 506 F. Supp. 3d at 789, the Court analyzes whether Relator qualifies as an original source separately under the 1986 and 2010 versions of the public-disclosure bar.

### A.     1986 Statute

Under the 1986 version of the public disclosure bar, "where an FCA claim has been publicly disclosed before a relator filed his complaint, the relator may bring a *qui tam* suit if he can show that (1) he has direct and independent knowledge of the information on which the allegations in his court-filed complaint are based and (2) he has voluntarily provided the information to the Government before filing his civil action." *Hartpence*, 792 F.3d at 1128 (citing 31 U.S.C. § 3730(e)(4)(B) (1986)). Under the first prong, "[t]o prove 'direct' knowledge, [the relator] 'must show that [it] had firsthand knowledge of the alleged fraud, and that [it] obtained this knowledge through [its] own labor unmediated by anything else.'" *See Amphastar Pharm.*, 856 F.3d at 705 (third through fifth alterations in original) (quoting *Alcan*, 197 F.3d at 1020). "To prove 'independent' knowledge, relators have to show they had relevant 'evidence of fraud prior to the public disclosure of the allegations.'" *Id.* (quoting *United States ex rel. Devlin v. California*, 84 F.3d 358, 361 n.5 (9th Cir. 1996)).

Defendants contend that Relator is not an original source because, as "an entity formed solely for the purpose of bringing a *qui tam* lawsuit," (*see* Reply at 5), it lacks direct knowledge.[6]  (*See* Mem. at 10–12.)  Relator responds that it "*did* have direct knowledge

---

[6] Defendants also contend that Relator "fails to allege it made a voluntary disclosure to the government." (*See* Mem. at 14.)  Although the 1986 version of the public-disclosure bar is jurisdictional, *see, e.g.*, *Prather v. AT&T, Inc.*, 847 F.3d 1097, 1102 (9th Cir. 2017), and Relator bears the burden of establishing that the Court has subject-matter jurisdiction, jurisdiction may be proven by evidence outside the pleadings.  *See, e.g.*, *Thornhill Publ'g*, 594 F.2d at 733 (collecting cases).  Here, Relator's counsel has submitted a declaration attesting that Relator made disclosures to "representatives of the United States

1   . . . from its own principals." (*See* Rel.'s 1st Supp. Br. at 7 (emphasis in original).)   For

2   purposes of the 1986 statute, however, the Court concludes that Defendants' cases support

3   the proposition that Relator does not have direct knowledge.[7]   In *United States ex rel.*

4   *Precision Co. v. Koch Industries, Inc.*, 917 F.2d 548 (10th Cir. 1992), *cert. denied*, 507

5   U.S. 951 (1993), for example, the Tenth Circuit affirmed the dismissal of a *qui tam* action

6   on the ground that the corporate relator did not have the requisite direct and independent

7   knowledge to qualify as an original source.   *See id.* at 554.   The corporate relator in that

8   case argued that, despite not being incorporated until June 1988, it possessed the

9   knowledge of information gathered by (1) its majority shareholder that formed the basis of

10  lawsuits he had instituted in 1981, 1982, and 1985; (2) its president between January and

11  June of 1988; and (3) its president after June 1988.   *See id.* at 553–54.   The Tenth Circuit

12  disagreed, noting that the corporate relator "made no showing it ha[d] a legitimate claim to

13  information gathered by [its majority shareholder] or [its president] prior to its formation."

14  *See id.* at 554.   As for the information gathered by its president after incorporation, that

15  / / /

16

17

18  Department of Justice – specifically, the Civil Deputy Chief and other individuals within the United States

19  Attorney Offices for the Southern District of California and the District of Columbia – . . . on March 21, 2019, April 1, 2019, April 3, 2019, and June 17, 2019." (*See* ECF No. 63 ("Lamprey Decl.") ¶¶ 2–4.)

20  Absent any challenge from Defendants as to the sufficiency of this proffer, (*see generally* Reply; Defs.' 1st Supp. Br.; Defs.' 2d Supp. Br.), the Court concludes that this suffices to establish that Relator made

21  the requisite disclosures under the 1986 version of the public disclosure bar.   *See, e.g., United States ex rel. Bly-Magee v. Premo*, 470 F.3d 914, 917 (9th Cir. 2006) (considering relator's declaration in

22  determining whether she qualified as an original source under 1986 version of public-disclosure bar); *United States ex rel. Godecke v. Kinetic Concepts, Inc.*, No. CV086403GHKAGRX, 2016 WL 11673222,

23  at *8–13 (C.D. Cal. Nov. 16, 2016) (same); *United States ex rel. Hartpence v. Kinetic Concepts, Inc.*, No. CV081885GHKAGRX, 2016 WL 8919455, at *12 (C.D. Cal. Nov. 16, 2016) (same).

24

25  [7] The Court concludes that Relator's case, *Minnesota Association of Nurse Anesthetists v. Allina Health System Corp.*, 276 F.3d 1032 (8th Cir. 2002), is not persuasive.   To the extent that case was correctly

26  decided, *see, e.g.*, Emily R.D. Pruisner, *The Extent of a Corporation's Ability to Constitute an Original Source Under the False Claims Act*—Minnesota Ass'n of Nurse Anesthetists v. Allina Health System

27  Corp., 87 Minn. L. Rev. 1247 (2003), the relator in that case was a "voluntary unincorporated association" that "ha[d] no legal status separate from its members."   *See Nurse Anesthetists*, 276 F.3d at 1049–50.

28  Unlike the relator in *Nurse Anesthetists*, Relator is "a[n organizational] plaintiff that did not exist at the time the information was discovered."   *See id.* at 1049.

"information [wa]s best characterized as a continuation of, or derived from[, the president's and the majority shareholder]'s individual investigations." *See id.*

Similarly, in *Federal Recovery Services, Inc. v. United States*, 72 F.3d 447 (5th Cir. 1995), the Fifth Circuit affirmed the district court's dismissal of an FCA claim brought by a corporate relator formed by the president of another company—that had previously sued its competitor for unfair trade practices related to the filing of false claims—and his attorneys five days before filing the *qui tam* action. *See id.* at 448. Relying on the Tenth Circuit's decision in *Koch*, the Fifth Circuit reasoned that the corporate relator "was not incorporated until well after [its incorporator's prior company] had investigated [the defendant]'s conduct and filed the state court suits against [the defendant]." *See id.* at 451. The Fifth Circuit rejected relator's argument that it had direct and independent knowledge of "information obtained after its incorporation" because the relator "was incorporated with the express purpose of pursuing qui tam litigation based on the information that others, either [its president's prior company] or [its president], had already obtained" and "[a]ny information collected after [the relator]'s incorporation was the product and outgrowth of the information that others had obtained prior to [the relator]'s incorporation." *See id.* at 452–53.

Here, as in *Precision* and *Federal Recovery Services*, Relator does not have direct knowledge of the information collected by its principals from before its formation on May 29, 2019, (*see* ECF No. 55-7 ("Ex. E")), less than a month before it filed this action on June 26, 2019. (*See generally* ECF No. 1.) Relator also fails to show that it collected any relevant information after it was formed or that any information it collected after that date was not a continuation of the knowledge of its principals. The Court therefore concludes that Relator is not an original source for claims presented before March 23, 2010.

Accordingly, the Court **DISMISSES** for lack of subject-matter jurisdiction Relator's claims as to any allegedly false claims presented before March 23, 2010.

/ / /

/ / /

19-CV-1199 TWR (WVG)

### B.    *2010 Statute*

Under the prong of the 2010 version of the public-disclosure bar under which Relator is proceeding, (*see* Opp'n at 12–17; Rel.'s 1st Supp. Br. at 5–8), "'original source' means an individual . . . who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section."  31 U.S.C. § 3730(e)(4)(B)(2) (2010).  "Though few courts have addressed the 2010 amendments to the definition of 'original source,' the removal of the word 'direct' appears to broaden the exception and permit a relator to qualify as an 'original source' of information even if that information was obtained indirectly."  *United States ex rel. Fryberger v. Kiewit Pac. Co.*, 41 F. Supp. 3d 796, 807 (N.D. Cal. 2014) (collecting cases); *accord Silbersher II*, 2023 WL 2593777, at *10.  Nonetheless, "[a]s a general matter, the requirement of 'independent' and 'material[ ]' knowledge is a meaningful hurdle to overcoming the public disclosure bar."  *United States ex rel. Jones v. Sutter Health*, 499 F. Supp. 3d 704, 717 (N.D. Cal. 2020) (second alteration in original).

Defendants make two arguments against Relator being an original source for purposes of the 2010 public-disclosure bar:  First, "an entity formed solely for the purpose of bringing a *qui tam* lawsuit cannot be an 'original source[,]'" (*see* Defs.' 1st Supp. Br. at 5), and second, Relator's "allegations do not materially add to the public disclosures" in the *Army Times* article and DoD final rule.[8]  (*See id.* at 6.)  Because the Court concludes

---

[8] Defendants also argue that "[Relator] does not allege that it made a voluntary disclosure to the government *at any time*[, which] is fatal."  (*See* Mem. at 14 (emphasis in original) (first citing *Sanches*, 2010 WL 4696835, at *7; then citing *Valeant*, 445 F. Supp. 3d at 408).)  Relator responds that, under the 2010 version of the public-disclosure bar, it is not required to plead around Defendants' affirmative defense.  (*See* Opp'n at 16–17 (citing *Nayab v. Cap. One Bank (USA), N.A.*, 942 F.3d 480, 497–98 (9th Cir. 2019)).)  Although such allegations may have been required under the 1986 jurisdictional version of the public-disclosure bar, *see, e.g.*, *United States ex rel. Yagman v. Mitchell*, 711 F. App'x 422, 424 (9th Cir. 2018) ("Nowhere does [the relator]'s complaint claim to have voluntarily provided the information in his complaint to the Government before filing."); *see also supra* note 6, Defendants cite no binding authority indicating that a relator must plead around the public-disclosure bar under the 2010 version of the statute.  Accordingly, the Court rejects Defendants' third argument that Relator is not an original source under the 2010 public-disclosure bar.

19-CV-1199 TWR (WVG)

that Relator's Complaint does not materially add to the public disclosures, the Court need not reach Defendants' first argument.  *See, e.g.*, *Sanches*, 2010 WL 4696835, at *7 ("If . . . someone republishes an allegation that already has been publicly disclosed, he cannot bring a qui tam suit, even if he had 'direct and independent knowledge' of the fraud." (quoting *United States ex rel. Wang v. FMC Corp.*, 975 F.2d 1412, 1419 (9th Cir. 1992), *overruled on other grounds by* <u>Hartpence</u>, 792 F.3d 1121)).

Although "[c]ourts have yet to fully flesh out the scope of the amended version of the statute," *see Sam Jones*, 2023 WL 2993409, at *6, "[t]he Ninth Circuit has held in a memorandum disposition that '[a]llegations do not materially add to public disclosures when they provide only background information and details relating to the alleged fraud— they must add value to what the government already knew.'"  *Jones*, 499 F. Supp. 3d at 717 (second alteration in original) (quoting *United States ex rel. Hastings v. Wells Fargo Bank, NA, Inc.*, 656 F. App'x 328, 331 (9th Cir. 2016)).  Defendants contend that "[Relator]'s allegations do not materially add to the public disclosures because the Complaint, at best, contains details and additional color regarding prior public disclosures that had already put the government on notice of the purported fraud."  (*See* Mem. at 13.) Relator responds that its "allegations clearly 'add[ed] value to what the government already knew[]'" because "[t]he Complaint adds specific, detailed information about how ESI coded its software with the intent to over-fill prescriptions and that ESI actively concealed its conduct from the government, among many other allegations found nowhere in Defendants' sources." (*See* Opp'n at 16 (first alteration in original) (quoting *Hastings*, 656 F. App'x at 331–32).)  Defendants rejoin that information regarding how ESI coded its software "merely adds detail or color to previously disclosed elements of an alleged scheme," (*see* Reply at 7 (quoting *United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 213 (1st Cir. 2016)), and that "[a]ny allegations regarding ESI's 'efforts to cover up the alleged fraud scheme . . . do not materially add to the core fraud allegations themselves, which already were publicly disclosed.'"  (*See id.* (second alteration in

/ / /

original) (quoting *United States ex rel. Jacobs v. JP Morgan Chase Bank, N.A.*, No. 20-20543-CIV-CANNON/Otazo-Reyes, 2022 WL 573663, at *7 (S.D. Fla. Feb. 25, 2022)).)

Although the Complaint clearly provides a greater amount of detail than the *Army Times* article and DoD final rule, the Court concludes that it does not materially add to the information disclosed by those sources.   In *Sanches*, for example, the district court concluded that additional information in the relator's complaint did not materially add to what had already been publicly disclosed.  *See* 2010 WL 4696835, at *7–8.  In that case, the prior Director of Finance for a municipal housing authority did not qualify as an original source for her FCA cause of action premised on the housing authority's false certification of reports to the United States Department of Housing and Urban Development ("HUD") to accumulate administrative funds in excess of the 105% cap.  *See id.* at *1, *6–8.  Although the relator discovered the alleged fraud through an audit in September 2007, *see id.* at *2, the funds exceeding the cap had been publicly disclosed in a staff report and public meeting held in mid-December 2006. *See id.* at *4.  The relator's complaint included additional information, including the false certification claims, *see id.* at *7, but the court concluded that her "allegations . . . regarding the false certifications are not necessary and do not add to what . . . already [had been] disclosed." *See id.* at *8.  Accordingly, the district judge concluded that the relator was not an original source and that her FCA claims were barred under the public disclosure bar.  *See id.*

Here, as in *Sanches*, the additional allegations in Relator's Complaint do not add materially to what already had been disclosed by the *Army Times* article and DoD final rule—"[a]t most, [Relator's] allegations add detail about the precise methodology [ESI] used" to perpetuate the alleged auto-refilling fraud. *See Calva*, 2018 WL 6016152, at *8 (citing *Hastings*, 656 F. App'x at 331–32; *Winkelman*, 827 F.3d at 211–213); (*see also* Reply at 7 (quoting *Winkelman*, 827 F.3d at 213 (1st Cir. 2016)) (citing *United States ex rel. CKD Project, LLC v. Fresenius Med. Care Holdings, Inc.*, No. 21-2117, 2022 WL 17818587, at *4 (2d Cir. Dec. 20, 2022))).  The Court also finds persuasive Defendants' argument that Relator's "allegations regarding ESI's 'efforts to cover up the alleged fraud

scheme . . . do not materially add to the core fraud allegations themselves, which already were publicly disclosed." (*See* Reply at 7 (alteration in original) (quoting *Jacobs*, 2022 WL 573663, at *7).)  Because the Court concludes that Relator's Complaint does not add materially to the disclosures previously made by the *Army Times* article and the DoD final rule, the Court also concludes that Relator is not the original source and that its FCA cause of action for the allegedly false claims submitted after March 23, 2010 is barred by the public-disclosure bar.[9]

## III.   Government Opposition

Even if the public-disclosure bar applies, the Court may not dismiss Relator's FCA cause of action if dismissal is "opposed by the Government." *See* 31 U.S.C. § 3730(e)(4)(A); *see also Valeant*, 445 F. Supp. 3d at 408 (citing 31 U.S.C.

---

[9] It bears repeating that, under the public disclosure bar, even those with independent knowledge of the alleged fraud cannot bring a qui tam action if they fail materially to add to the transactions or allegations that already have been publicly disclosed. *See Sanches*, 2010 WL 4696835, at *7 (quoting *Wang*, 975 F.2d at 1419).  Being an insider does not suffice. *See, e.g.*, *Sam Jones*, 2023 WL 2993409, at *1 (finding public disclosure bar applied to FCA suit filed by LLC comprised of former sales representatives for the defendant); *Sanches*, 2010 WL 4696835, at *1 (finding public-disclosure bar applied to FCA claims brought by former director of finance of the defendant).  Here, for example, Relator's members include the PIC of ESI's Tempe location, who was employed at ESI from October 2009 until March 2018, (*see* Compl. ¶ 7; *see also id.* ¶ 54), which corresponds to the relevant period for this action.  (*See id.* ¶ 2.) Although Relator's PIC member was aware of—and internally raised concerns about—the internal fraud years before the *Army Times* article was published, (*see, e.g.*, *id.* ¶¶ 54, 56, 88–89), he did not report his concerns to the government or file his FCA claim until many years later, after his employment with ESI had ended.  (*Compare id.* ¶ 7 (indicating that PIC's employment ended in March 2018), *with* ECF No. 1 (filed June 26, 2019); *and* Lamprey Decl. ¶ 4 (noting that Relator met with the government regarding the allegations in its Complaint in March, April, and June of 2019)).)  "Qui tam suits are meant to encourage insiders privy to a fraud on the government to blow the whistle on the crime." *Valeant*, 445 F. Supp. 3d at 402 (quoting *United States ex rel. Fine v. Chevron, U.S.A., Inc.*, 72 F.3d 740, 742 (9th Cir. 1995) (en banc)).  While the public-disclosure bar is generally viewed as a mechanism to strike a balance "between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own[,]" *see Mateski*, 816 F.3d at 577 (quoting *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 294 (2010)), cases such as *Sam Jones*, *Sanches*, and, ultimately, this one serve as a reminder that "*[q]ui tam* suits are meant to encourage insiders privy to a fraud on the government to blow the whistle on the crime . . . [by] reward[ing] those brave enough to speak in the face of a 'conspiracy of silence,' and not their mimics." *See Wang*, 975 F.2d at 1419 (quoting S. Rep. 345, 99th Cong., 2d Sess. (1986) at 6, reprinted in 1986 U.S.C.C.A.N. 5266, 5271).  In other words, Relator may well have qualified as an original source had it—or its members—blown the whistle more promptly.

§ 3730(e)(4)(A)).  Here, "[t]he government declined to intervene[,]" (*see* ECF No. 18); "did not file an opposition to [D]efendants' [M]otion to dismiss," (*see generally* Docket); and did not "appear at the [April 2023] hearing on the [M]otion[,]" (*see* ECF No. 75; *see also* 4/27/23 Tr.).  *See Valeant*, 445 F. Supp. 3d at 408.  Accordingly, the Court **DISMISSES** Relator's FCA claim based on the public-disclosure bar.  *See id.*

**CONCLUSION**

In light of the foregoing, the Court **GRANTS** Defendants' Motion to Dismiss (ECF No. 55), **DISMISSES WITHOUT PREJUDICE** Defendant ESHC, and **DISMISS WITHOUT PREJUDICE** pursuant to the public-disclosure bar Relator's first and only cause of action for violation of the False Claims Act.  Although the Court believes it is unlikely that Relator will be able to amend its complaint to cure the deficiencies outlined herein, Relator **MAY FILE** an amended complaint within <u>twenty-one (21) days</u> of the electronic docketing of this Order.  *Should Relator decline timely to file an amended complaint, this action will be dismissed without prejudice and this case will be closed without further Order of the Court.*

**IT IS SO ORDERED.**

Dated:  June 16, 2023

Honorable Todd W. Robinson
United States District Judge

19-CV-1199 TWR (WVG)